FILED
6/10/14 8:22 am
CLERK
U.S. BANKRUPTCY
COURT - ERIE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                                          :
MATTERS INVOLVING THE PROFESSIONAL              :      Misc. No. 14-205-TPA
CONDUCT OF JASON J. MAZZEI, ESQ. AND            :
D/B/A MAZZEI & ASSOCIATES IN MATTERS            :
BEFORE THE COURT                                :
                                                :
     JASON J. MAZZEI, ESQ.,                     :
            *Movant*                            :      Related to Doc. No. 28
                                                :
        v.                                      :
NO RESPONDENT                                   :

                               AND

IN RE:                                          :
ALL CASES IN WHICH JASON J. MAZZEI              :      Misc. No. 13-203-TPA
IS ATTORNEY OF RECORD                           :
                                                :
     JASON J. MAZZEI, ESQ. and                  :
     PAUL W. McELRATH, JR., ESQ.,               :
            *Movants*                           :      Related to Doc. No. 35
                                                :
        v.                                      :
RONDA J. WINNECOUR, ESQ.,                       :
     TRUSTEE                                     :
            *Respondent.*                       :

*Appearances:*        Jason J. Mazzei, Esq., for himself and Mazzei & Associates
                      Paul W. McElrath, Jr., Esq., for McElrath Legal Holdings, LLC
                      Ronda J. Winnecour, Esq., the Chapter 13 Trustee

## **MEMORANDUM OPINION**

Presently before the Court, filed in the above two Miscellaneous Docket matters, are

substantially identical[1] motions requesting the Undersigned to recuse himself in both of these

---

[1]    The only substantive differences that the Court has been able to discern are the identities of
the Movants and Respondents, and the fact that the Motion filed in Misc. No. 13-203 is identified as
"expedited." In all other respects they appear to be identical.

matters[2] pursuant to *28 U.S.C. §455(a) and (b)(1).*  See ***Motion to Request That Judge Thomas P. Agresti Recuse Himself under 28 U.S.C. § 455 from All Cases Where Jason J. Mazzei, Esquire Is Attorney of Record,*** filed at Doc. No. 28 in Misc. No. 14-205, and, ***Expedited Motion to Request That Judge Thomas P. Agresti Recuse Himself under 28 U.S.C. § 455 from All Cases Where Jason J. Mazzei, Esquire Is Attorney of Record***, filed at Doc. No. 35 in Misc. No. 13-203.  For the sake of convenience, the term "the Motions" will be used to refer to both of these filings collectively.

### BACKGROUND

Misc. No. 13-203 was originally opened on September 24, 2013, to address a motion seeking an order authorizing the substitution of Paul V. McElrath, Jr. ("McElrath") for Jason J. Mazzei ("Mazzei") on an omnibus basis in all active cases in which Mazzei was the attorney of record.  The case was assigned to the Undersigned on a random, rotational basis that same day.  The case was closed on October 30, 2013, for non-compliance with a court order, and then a motion to

---

[2]     Even though the *Motions* ask the Undersigned to recuse himself in all pending matters in which Jason J. Mazzei is an attorney, they were filed only in the two Miscellaneous Matters as noted.  The Court has previously determined, and by order so advised the Movants, that the *Motions* are only effective to raise the issue of recusal in the two Miscellaneous Matters in which they were filed.  As to the remaining cases in which Mazzei is involved as an attorney, involving hundreds of cases in which he represents individual debtors, he of course has a duty to consult with his clients in each such case and determine whether they wish to ask the Undersigned to recuse himself.  The Court further notes that many of these cases are likely proceeding along with little or no expected direct involvement from the Court, perhaps making any attempted recusal an unnecessary expense and distraction for those debtors.  The Court finally notes that a blanket recusal in all such cases could impose a monumental administrative burden that should not be taken lightly.  For all of these reasons, if the Movants or Mazzei himself seek recusal in any other matter, they must seek relief separately in each individual case, or file an appropriate motion seeking leave to proceed on an omnibus basis with respect to these other matters and explaining why omnibus treatment should be permitted.  As a practical matter, since the filing of the *Motions*, the Court has heard 35-40 pending matters involving Mazzei attorneys.  In each of those cases the Mazzei attorneys have been asked by the Court if they would like the matter delayed pending a hearing on recusal.  In each of the matters, the Mazzei attorneys have waived the effect of the *Motions* and the hearings have proceeded to conclusion.

2

reopen the matter was filed on March 3, 2014, along with a new motion to substitute counsel which narrowed the scope of relief being sought by only seeking such substitution in those cases where the debtors had expressly consented to the substitution of McElrath for Mazzei. Both the motion to reopen and the narrowed motion to substitute were granted on March 7, 2014, though the latter motion was only granted in part, the Court refusing at that time to authorize the Chapter 13 Trustee to begin making monthly distributions for attorney fees in the cases in question to McElrath rather than to Mazzei. McElrath and Mazzei have nonetheless continued to pursue that aspect of the requested relief, see the *Motion to Approve Joint Stipulation* filed on April 7, 2014, at Doc. No. 17, hence Misc. No. 13-203 still remains open.[3]

The other proceeding involved in the *Motions*, Misc. No. 14-205, was opened on April 2, 2014, when Chief Judge Deller entered an order directing the Undersigned to conduct an inquiry into whether any disciplinary measure should be imposed against Mazzei for "an overall and/or systemic pattern of professional misconduct in matters before this Court." At the conclusion of this inquiry, I [4] was further directed to make a Report and Recommendation to Judge Deller,

---

[3]     The Undersigned allowed payment of the April Chapter 13 distribution to be made to McElrath as an emergency measure. See Misc. No. 13-203, Doc. No. 22. Due to the filing of the pending recusal motion in Misc. No. 13-203, responsibility for the discrete aspect of consideration of any further monthly Chapter 13 distributions was transferred to the Hon. Gregory Taddonio on May 23, 2014. See, Doc. No. 36.

[4]     This Court's normal and longstanding practice is to avoid the use of the words "I", "me" or "my" when issuing opinions and orders in accordance with the judicial philosophy that it is the Court as an entity that is acting, and that it is better if the language used reflects that view. Since the *Motions* are so personally directed to the Undersigned as an individual, however, it is difficult to consistently follow that practice here without thereby running the risk of being vague or ambiguous, or resorting to awkward verbal formulations. The Court's normal practice has therefore been loosened herein as appropriate to avoid such problems.

whereupon he individually, or in concert with all of the judges of the Court, would decide whether any such disciplinary measures would be imposed.

Unlike what occurred in Misc. No. 13-203, Chief Judge Deller's appointment of me in this matter was not just some random occurrence. It was made only after it had become clear to the entire Court that Mazzei was engaging in conduct that threatened the integrity of the bankruptcy system in this District as a whole.[5]    As noted in Judge Deller's appointing order, I had extensive prior judicial experience with much of Mazzei's conduct over the past several years, which conduct has raised concerns among the members of the entire Court. This experience was gleaned both during my term as Chief Judge when private complaints as to his misconduct were made directly to me, as well as in my capacity as the "point person" for matters involving the creation of the Court's Loss Mitigation Program ("LMP") during the period of 2012-2013.

Notable among this Court's experiences in this regard has been the receipt and review of a very thorough report by a Court-appointed expert addressing many, but by no means all, of the

---

[5]    One might expect that prior to this time the United States Trustee ("UST") would have done something in the first instance to formally address Mazzei's conduct because, by her own prior acknowledgment, she is the "enforcer" of the bankruptcy laws with Congressional mandate to bring proceedings against those who deviate from the standards imposed by the Bankruptcy Code. See Paragraph 2 of the UST's *Objection to Countrywide's Motion to Quash the Notice of Examination Under Fed.R.Bankr.P. 2004 and Service of Subpoena (Duces Tecum)* filed on November 13, 2007 at Doc. No. 16 in *In re Countrywide Home Loans, Inc.*, Misc. No. 07-00204. The UST has the statutory responsibility to "present and protect the public" and the "public interest" and to investigate as necessary in doing so. *Id.* at Paragraph 3. The UST has self-described her role as being the "bankruptcy watchdog," a term subsequently adopted by the Court in the *Countrywide* matter in its opinion finding that the UST had the authority to take 2004 Examinations and serve subpoenas duces tecum on a creditor she suspected of abusing the bankruptcy process. See the *Brief* of the UST in Misc. No. 07-00204 filed on December 28, 2007 at 21 ("... the UST has a duty – as the "bankruptcy watchdog" – to take action, and this Court should demand nothing less."), and *In re Countrywide Home Loans, Inc.,* 384 B.R. 373, 391 (Bankr. W.D. Pa. 2008) (Agresti, J.) ("The UST ... has been charged to act as a watchdog to protect the integrity of the bankruptcy system.")

areas of concern involving Mazzei.   The appointment of the expert with a charge to investigate and

report back to the Court was  explicitly consented to by Mazzei, acting with the benefit of legal

counsel. *See, In re Dietrich*, Case No. 11-23556, *Consent Order* dated June 10, 2013, Doc. No. 131.

Chief Judge Deller concluded that this Court's overall experience and my familiarity with the expert

report made me the "logical candidate" among all the judges of the Court to conduct the inquiry into

Mazzei's practices.

## *LEGAL DISCUSSION*

Movants have filed the *Motions* pursuant to *28 U.S.C. §455* asking that this Court

recuse itself from the case, based largely on the same extensive judicial experience that prompted

Chief Judge Deller to designate me to oversee Misc. No. 14-205 in the first place.  It is clear that

*Section 455* applies to judges of the bankruptcy court.  *See, Fed.R.Bankr.P. 5004(a)*.  The specific

portions of *Section 455*  upon which Movants rely are subsections (a) and (b)(1), which state:

> (a) Any justice, judge, or magistrate judge of the United States shall
> disqualify himself in any proceeding in which his impartiality might
> reasonably be questioned.

> (b) He shall also disqualify himself in the following circumstances:

>> (1) Where he has a personal bias or prejudice concerning a
>> party, or personal knowledge of disputed evidentiary facts
>> concerning the proceeding;

*28 U.S.C. §455(a), (b)(1)*.  The Movants assert that I must recuse myself because I have a personal

bias or prejudice against Mazzei, and also because I have personal knowledge of disputed

evidentiary facts.

5

In broad terms, a matter involving *Section 455* involves a two-step analysis. *See In re Reese*, 482 B.R. 530, 533-34 (Bankr. E.D. Pa. 2012). First, there must be a factual basis to support the recusal motion, not merely rumors, innuendo, or erroneous information. For that reason, the Court scheduled a hearing for May 28, 2014, to allow the Movants an opportunity to set forth their factual basis for the relief they are requesting. As it turns out, the Movants did not add anything to the factual basis in support of the *Motions* at the hearing beyond what was already alleged in the *Motions* themselves.

The only witness called at the hearing was Mazzei who testified only briefly on direct examination, and then only to reiterate the allegation in Paragraph 3(b) of the *Motions* to the effect that at one point in the "off the record" colloquy in connection with a May 31, 2013 hearing in *Dietrich*, I "angrily" called him a "sociopath." Therefore, this sole reference to the off the record colloquy and certain quoted transcripts from several other hearings identified in the *Motions* constitute the entire universe of facts upon which the Movants rely in support of their position that I should recuse myself.

Second, disqualification is appropriate only if the facts as established provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality. Importantly, as stated by the U.S. Supreme Court, "all of the circumstances" must be considered in making the determination whether a reasonable person would question the Judge's impartiality. *Sao Paulo State of the Federal Republic of Brazil v. American Tobacco Co.*, 535 U.S. 229, 233 (2002).

6

With specific respect to the "bias or prejudice" prong of *Section 455*, for the purported bias or prejudice to be disqualifying, typically it must be "personal," as opposed to "judicial." In other words, the alleged bias and prejudice must generally stem from an extrajudicial source and result in the judge holding an opinion on the merits on some basis other than what the judge learned from his or her participation in the current or prior judicial proceeding.

That general rule has sometimes been referred to as the "extrajudicial source doctrine" although as stated by the court in *Liteky v. U.S.*, 510 U.S. 540 (1994) it would be more accurate to refer to it as the "extrajudicial source factor."

The *Liteky* court explained that the textual basis for disqualification for "personal bias or prejudice" under *Section 455(a)* and *(b)(1)* is the "pejorative connotation" of the words "bias or prejudice," which indicates a judicial predisposition that goes beyond "what is normal and acceptable." 510 U.S. at 551-52. Although such improper predisposition, if it exists, will usually come from an extrajudicial source, it is at least theoretically possible for disqualifying personal bias or prejudice to spring from a judicial source. As the *Liteky* court explained:

> It is wrong in theory, though it may not be too far off the mark as a practical matter, to suggest, as many opinions have, that "extrajudicial source" is the *only* basis for establishing disqualifying bias on prejudice. It is the only *common* basis, but not the exclusive one, since it is not the exclusive reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as "bias" or "prejudice" because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment.

7

510 U.S. at 551 (emphasis in original). The *Liteky* court found that recusal based on facts adduced in events occurring before the judge would be required only "rarely." *Id.* at 554.

Thus, recusal is not usually required when the judge has reached an opinion based upon what has gone on in open court, or because he has presided over some other case involving the same party. Wright & Miller, *Federal Practice & Procedure § 3542* (2008). Additionally, it will not ordinarily suffice for disqualification that during the course of a case the judge has made remarks critical of a party, or that there were other indications of friction. *Id.*

In the present case, to the best of my knowledge, and Movants have offered nothing to counter this belief, all of the sources of opinion I have concerning Mazzei's conduct have been formed within the context of judicial proceedings. That is to say, I am not aware of any extrajudicial source that has factored into my opinion. I indicated this at the hearing on the *Motion*s and the Movants did not dispute it. Thus, pursuant to the recusal standard as set forth in *Liteky*, any "predispositions" I may have developed over time would fall into the category that would only "rarely" suffice to require recusal.

### THE FACTUAL RECORD AS STATED IN THE MOTIONS

The *Motions* allege that this Court has engaged in a "pattern of conduct" against Mazzei and his firm such that no reasonable person could conclude that it is impartial and unbiased toward him. *Motions* at ¶2. The *Motions* go on to cite a number of specific instances which, as indicated previously, constitute the entirety of the "factual basis" being put forward by the Movants

8

in support of the requested recusal because they added nothing further at the hearing on May 28th. The Court will examine each such instance in the order they appear in the *Motions*.

### 1.  Cihon, Case # 09-11413 (Motions, Par. 3(a))

Movants  point to the following statement the Court made to Mazzei at the hearing in *Cihon* held on March 14, 2013 ("*Cihon* hearing"):

There's a new world order coming and you're the target.

The Court has reviewed the entire transcript from the *Cihon* hearing.  While the words are quoted accurately in the *Motions*, they must be put in the proper context.

The *Cihon* hearing concerned a motion by Mazzei on behalf of his debtor/client seeking a second extension of time for an LMP deadline.  The *Cihon* hearing occurred less than 6 months after the inception of the LMP, at a time when  the individual judges of the Court had made the decision to no longer hear LMP-related matters in their own cases.  That change was being made because it was apparent that too many of the attorneys for parties to LMP proceedings were not acting vigilantly to meet the initial deadline, but rather resorting to the easy expedient of seeking one or multiple time extensions, to the detriment of one of the key goals of the program, *i.e.*, quick resolution.  As a result,  the Board of Judges decided to place all LMP-related matters under one administrative judge so as to establish structure and consistency in the operation of the new LMP program.  Since I was primarily responsible for the creation of the LMP while serving as Chief Judge and possessed extensive knowledge about the program, both procedurally and substantively, I became that single LMP judge shortly after the *Cihon* hearing.

Mazzei was by far and away the chief offender among the debtor attorneys who were responsible for this situation. The particular comment at the *Cihon* hearing referred to in the *Motions* was the culmination of a colloquy between myself and Mazzei concerning inquiries that I directed to him to make sure that he was not going to attempt to profit from the delay in concluding the LMP by charging his clients for routine requests for status updates made by him or his office during that process. I explicitly informed Mazzei that the LMP was not intended to simply be a fee-generating tool for attorneys, and that he should not expect to be paid for such unproductive activity. I further noted that based on my experience in fee applications he had filed in other matters, he tended to bill for every conceivable thing ("every ounce of breath you allegedly take on behalf of your client"), and that such would no longer be tolerated. Furthermore, I was aware of the enormous number of LMP cases he had filed, especially when compared to other high volume practitioners, and his failure to perform the work related to the task. This was a concern to the entire Court and it had the appearance of a money grab on Mazzei's part. It was then that the "new world order" comment was made.

I would further note that the phrase "new world order" is in my standard lexicon and is often used by me as a rhetorical flourish for effect without any accompanying suggestion of an underlying sinister or prejudicial mind set. *See, e.g.*, the hearing held on July 22, 2013 in *Durci* (#10-24108), *Lawhorn* (#10-26107), and *Jenkins* (#11-23555), none of which involve Mazzei, where I used the phrase in discussion with representatives of mortgage lenders to impress upon them the necessity of complying with the LMP rules. This is a relevant circumstance of which the hypothetical member of the public would be aware when considering whether the comment in *Cihon*

demonstrates a reasonable basis for doubting my impartiality. *See Sao Paolo, supra.* Considering the facts and all relevant circumstances I do not find that the statement at the *Cihon* hearing requires my recusal under *Section 455(a)* or *(b)(1)*.

### 2.    *Dietrich, Case No. 11-23556 (Motions Par. 3(b))*

The *Motions* next refer to a hearing held in the *Dietrich* case on May 31, 2013, (*Dietrich* hearing") and allege that "following" it I "angrily" called Mazzei a "sociopath" in the presence of number of individuals who were in the courtroom at the time. The *Motions* are incorrect as to this item in one important respect. As conceded by Mazzei at the May 28[th] hearing on the *Motions* in response to questions posed by the Court and as clearly reflected in the record, the comment in question was made to Mazzei not "following" the *Dietrich* hearing, but during a segment of the hearing which, with the consent of Mazzei and his attorney, was being conducted "off-the-record" before conclusion of the hearing.

The *Dietrich* matter was being heard as part of an omnibus Order to Show Cause entered on May 20, 2013, concerning 44 individual cases (including *Dietrich)* in which Mazzei had submitted LMP applications on behalf of his clients, all filed for sake of convenience in the *Dietrich* case ("*Dietrich* OTSC"), and one of the 44 separate orders to show cause that I had issued against Mazzei. See *Dietrich* Doc. No. 124. After a full-blown hearing on the *Dietrich* OTSC, during which Mazzei chose not to contest any of the facts set forth in the *Dietrich* OTSC, procedurally, the Court was in a position to render its decision and write an opinion. At that point, following the lead of Mazzei's counsel, who first initiated the thought of an off the record colloquy when he stated during

11

the hearing that he "was looking for a way out of this" in hopes of a resolution that would allow
Mazzei to continue his attempt at concluding at least some of the outstanding LMP matters, the
Court decided to go off the record to discuss the mechanics of a proposed resolution. Rather than
put the Court's findings directly on the record, either orally or via an opinion and indicating that any
written opinion would be unfavorable to Mazzei, the Court presented to Mazzei an opportunity to
enter into a consent order. I explained to him that if he chose this route he would avoid a formal
finding of misconduct and the associated opinion that would outline in detail his transgressions,
resulting in the attendant extremely negative publicity to him including the possible loss of his
ability to practice in the Bankruptcy Court.

Prior to going off the record, Mazzei had been afforded an opportunity to present
evidence to rebut any of the findings raised in the OTSC. On the advice of counsel Mazzei chose
not to contest the facts set forth in the OTSC but to voluntarily submit himself to the mercy of this
Court. In the off the record colloquy, I advised Mazzei that since the evidentiary phase of the
hearing on the *Dietrich* OTSC was concluded the Court was prepared to render it's decision. An off
the record colloquy was employed so that I could be bluntly candid with Mazzei about how the
numerous instances of apparent misconduct by him that had come to my attention, not just in
*Dietrich* itself, but in a multitude of cases, were affecting his reputation with the Court. I made my
comments off the record knowing that the language I would be using to describe the level of my
dissatisfaction and frustration would be harsh, and hoping that perhaps he might thereby be spared
the opprobrium that would likely follow if such a judicial rebuke had been made publically on the
record. Since Mazzei has chosen to introduce these off-the-record remarks into the public record,

12

my original reason for trying to maintain some semblance of confidentiality is no longer operative and the full context in which the remarks were made can now be discussed.

This Court gave Mazzei a chance at redemption during the off-the-record discussion when it proposed a list of conditions for him to consider in the form of a Consent Order that would allow him to fully consider a more palatable approach to resolution of the situation he faced, while at the same time also offering a chance to at least some of the debtors who through his inaction had been cheated out of their opportunity to possibly achieve loss mitigation relief in the LMP.

During the off the record colloquy and before relating to Mazzei the terms of the Consent Order the Court was considering, I made Mazzei clearly aware of what this Court's findings would be if it was required to write any opinion emanating from the closed *Dietrich* OTSC evidentiary record. In addition to the closed evidentiary record in the *Dietrich* OTSC matter, those findings would be based upon everything the Court had been made aware of about Mazzei's conduct to date as a result of numerous matters I had heard during the prior one year period in which his misconduct became ever so clear: his handling of expense retainers, the billing of his clients, the issues related to his handling of the *Snavely* matter, and his failure to timely prosecute upwards of 460 LMP applications yet still seeking the $1,000 no look fee in hopes of claiming upwards of $460,000 in unearned fees. Following my comments and after allowing Mazzei to discuss the matter in private with his lawyer for approximately 20 minutes, Mazzei returned and indicated that his preferred approach was by way of the Consent Order the Court had offered. At that point, the record was reopened and I restated the terms of the Consent Order on the record, received Mazzei's agreement to the same and finally adjourned the hearing.

13

Mazzei signed the Consent Order in *Dietrich* 10 days *after* the hearing on May 31st and while represented by counsel who was himself present at the hearing when the off-the-record "sociopath" remark was made. Clearly the proposed procedure involving the expert and other matters that I had outlined at the *Dietrich* hearing, and then in the draft consent order, contemplated my continuing involvement in the implementation thereof. If Mazzei was concerned that anything that I said at the hearing was so egregious that it raised questions about impartiality or bias he certainly had an ample opportunity to raise recusal in a motion before ever agreeing to the Consent Order. He never did so. The fact that he has only done so now, almost a year later on the eve of the hearing in the Miscellaneous Matters, calls the credibility of his argument into question and supports a finding of his further attempt at manipulating the bankruptcy system.

Did I express indignation over Mazzei's conduct and liken it to a sociopath in the off the record remarks? Absolutely! As to the substance of what was said at the *Dietrich* hearing, I used the term "sociopath" with reference to Mazzei not in any sort of psychological, diagnostic sense, but rather as a colloquial shorthand label due to his conduct that I had observed in this and many other cases. I believe most people would understand such label to mean someone who displayed such traits as a lack of remorse or shame, manipulative behavior, and the ability to lie in order to achieve a desired goal. That is exactly the sort of behavior I had observed from Mazzei on multiple occasions and admonished him for, each time, on the record. I could perhaps have chosen more subtle language to make the same point about my experience with Mazzei, but again these were off the record remarks designed to impress upon Mazzei the seriousness of the circumstance he faced. I was not overly-concerned about sparing his feelings.

14

Mazzei has not cited any legal authority to support the proposition that my blunt use of the word "sociopath" to describe him in the circumstances as described above is grounds for recusal. My own research has found cases indicating it is not.

For example, in *Lewis v. Robinson*, 67 Fed. Appx. 914 (6th Cir. 2003), a habeas corpus proceeding, the state trial court judge in the underlying criminal case had directed many derogatory remarks to the petitioner during the course of the proceeding, including that he was a "sham," a "shill," and a "sociopath." The Sixth Circuit found that although such remarks may not have been necessary, they did not make a fair judgment impossible. In *State v. Kuenzi*, 350 Wisc. 2d 506 (Wis. App. 2013) the trial court judge referred to the defendant at sentencing as a "sociopath," along with some other colorful and derogatory terms. The defendant argued that this language revealed a "pervasive animus" against him which should have led the judge to recuse himself, but the appeals court found that the "unusually strong and vivid language" was based on the facts before the trial court and would not lead a reasonable person to conclude the judge could not reach a fair decision.

The U.S. Supreme Court itself has recognized that judges can understandably display strong reactions to events which have occurred before them in their official capacity without thereby becoming subject to recusal on the basis of bias, prejudice, or lack of impartiality. As the court stated in *Liteky, supra* :

> ... opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion

15

unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. ... Not establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what ... men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration — remain immune.

510 U.S. at 555-56.

Among the "facts introduced" and "events occurring" in the *Dietrich* and other matters involving Mazzei that caused this Court to use such forceful language directed to Mazzei at the *Dietrich* hearing were the following:

- I had discovered that Mazzei was charging and receiving from clients an advance "expense retainer" of up to $950 in his Chapter 13 cases, without ever disclosing that fact in his *Rule 2016 Statement* or obtaining approval from the Court. Considering the number of case filings by Mazzei, over time, in excess of 1.6 million dollars was potentially taken by Mazzei from the pockets of his clients in an improper/unlawful manner.

- I had discovered that Mazzei thereafter never even attempted to "reconcile" actual costs incurred so that his clients could receive the credit rightfully due them, in violation of the implicit promise to do so in his own fee agreement.

- I had observed Mazzei almost single-handedly threaten the very existence of the Court's new LMP in its infancy by indiscriminately filing LMP applications in over 460 of his cases, and then doing nothing at all or only the bare minimum to move the matters to conclusion, solely because of the lure of the $1000 "no look" fee that the Court had decided lawyers in the program could charge without further Court review.

16

- I discovered that Mazzei had essentially defrauded the Court in numerous cases by filing applications to pay the filing fee in installments which falsely represented that the debtor could not afford to pay the filing fee at once when in fact the debtor had already paid Mazzei the previously mentioned "expense retainer" of $900-950.

- I had become aware of the pattern of other sorts of abusive practices by Mazzei that were detrimental to his clients, and to the Court as an institution.  For instance, the *Snavley* matter, Case No. 12-11176,  in which Mazzei took advantage of a recently-widowed debtor, causing her to pay an exorbitant fee for an unnecessary bankruptcy filing.

- I was becoming aware of abusive fee application practices by Mazzei in his Chapter 13 cases, for instance billing clients for *de minimis* services, charging for paralegal time when the employee had no paralegal certifications, charging for time that should have been non-billable secretarial or administrative time, and charging excessive time for such things as attendance at Section 341 meetings, where he would routinely bill clients an hour or more for a meeting that may actually have taken no more than 5 or 10 minutes.

- I was aware that Mazzei had made numerous verbal, false representations to me at hearings.  This happened so frequently as to almost come to seem routine.  Moreover, it has continued right to the present.  For instance, in a recent hearing in the Misc. No. 13-203 matter Mazzei asserted that there had been no sale of his practice to Paul McElrath, even though McElrath, standing in court just a few feet from him, stated otherwise, and even though there would be no other apparent reason why Mazzei would seek to have McElrath substituted for him as counsel on an omnibus basis and transfer the right to receive ongoing Ch. 13 fee payments to McElrath in 906 cases. Indeed, in a hearing held just a few days ago in Misc. No. 14-205 Mazzei disingenuously stated that he had not objected to all of the factual conclusions in the OTSC and the expert's report when he had in fact done so by a separate pleading in which he specifically disputed each and every one of the 44 findings of fact leveled against him.  And in the *Dietrich* OTSC case itself, just before the off the record colloquy, Mazzei once again was caught in the act of lying to the Court when trying to explain why he tampered with Court documents which matter first arose during the May 10th OTSC hearing in the *Brigger* case.[6]

---

[6]     Mazzei also admitted during the evidentiary phase of the *Dietrich* OTSC hearing that even though he had performed no LMP services other than filing the initial application in the *Dietrich* case, itself, he had already claimed and been paid the $1,000 LMP no-look fee.  The Court directed immediate disgorgement of those monies.

The Court could go on, but the point should be clear: I was aware of numerous, serious breaches of professional conduct by Mazzei at the time of the *Dietrich* hearing and I was (and am) offended by them.

Showing no remorse or contrition for all his lies, his manipulation of the system, his total lack of any concern for the welfare of his clients, for the fact that his failure to perform and missing of deadlines in upwards of 300 LMP cases, jeopardizing any chance of his clients ever saving their homes, or putting them into a program for which their situation was not suited, yet exhibiting absolutely no qualms about charging them for his ghost services, and having the audacity to lie to me again just moments earlier during the hearing on the *Dietrich* OTSC about falsifying and changing court documents in order to yet again preserve fees in certain LMP cases, it is within this backdrop that the Court held the May 31st off the record colloquy.   This is the context in which the Court made its comments about Mazzei's conduct and what  its findings would have been in the event it was required to issue a formal opinion in the pending *Dietrich* OTSC matter.

New examples of Mazzei's abusive practices, arrogance, and lack of remorse continue to manifest themselves even following the entry of the Consent Order.  For instance, in *Acton*, Case No. 11-11547, as recently as May 6th, the Court received a letter from the debtor setting forth some complaints she had about Mazzei's representation of her in that case.  As I usually do in such circumstances, I entered an order attaching a copy of the letter and directing Mazzei to file a response. He did so on May 24th, just a few days ago.  For present purposes, I will focus on only one aspect of that response.

18

According to Mazzei, the debtor had been making installment payments to him over the course of two years for purposes of a Chapter 7 filing. By May 14, 2009, the debtor had paid Mazzei the total, required payment of $2,100, representing $1,200 as his fee and a $900 retainer for costs. Mazzei says he then began preparing the filing but alleges the debtor did not cooperate fully so on September 20, 2009, a letter was sent to the debtor, at the instruction of Mazzei, stating that the debtor had to contact him within 15 days to provide the necessary information to file a petition or the file would be closed and Mazzei would keep the entire $2,100. *See*, Doc. No. 64 at Exhibit A.

The stunning thing to me about this is that Mazzei also included his billing records in the response, and they show that the total fees which had been incurred up to September 20, 2009, was only $397.50 with total costs incurred of only $1.32. In other words, although total fees and costs incurred were less than $400, Mazzei was prepared to keep the entire $2,100 which the debtor had paid him.[7]

By his own admission, Mazzei was prepared to pocket $1,700 which he had in no way earned, and the Court would have been none the wiser. In what way can he possibly think this is an acceptable practice? In how many cases has it actually occurred? Does he not understand that the Bankruptcy Code does not allow him to exploit debtors in this manner? The very fact that Mazzei relates such a troubling incident in such an unapologetic and unashamed manner harkens back to the

---

[7]    As it turns out, the debtor did contact him and opted for a Ch. 13 filing, so that did not happen.

off the record description of his conduct as that of a sociopath.

It has been written that a sociopath is a person with personalty traits characterized by a disregard for the feelings of others, a lack of remorse or shame, manipulative behavior, unchecked ego-centricity and the ability to lie convincingly in order to achieve one's goals. The multiple instances of Mazzei's recorded conduct before this Court bears out the Court's comment in that regard, and that would have been the description of his conduct in any opinion written by the Court had he not opted for entry of the Consent Order. All of these instances were judicially- related. The Court does not believe that any "predisposition" concerning Mazzei that may have thereby been developed are among those in the rare group of such events that require recusal.

### 3.   *Nelson, Case No.08-11842 (Motions Par. 3(c))*

The next instance of purported bias cited in the *Motions* relates to statements made by the Court to Mazzei in the *Nelson* case at a hearing on March 14, 2013 ("*Nelson* hearing"). The Court has reviewed the complete transcript of the *Nelson* hearing. While the statements as set forth in the *Motions* are accurate, they are not set forth in the same order in which they were actually made at the hearing, and they omit intervening material that helps to provide the context in which the statements were made.

To set that context just a bit, *Nelson* was one of the numerous cases in which Mazzei had filed an LMP application under circumstances where it was clearly not appropriate because the debtor was current on her mortgage payments and faced no imminent threat of foreclosure. The

20

LMP application was clearly ineligible under the eligibility requirements of our LMP. Two months later, after apparently realizing that the case had no business being in the LMP, Mazzei moved to withdraw the LMP application but never indicated that his fee would be disgorged or waived. The Court scheduled a status conference in response, which was the March 14th *Nelson* hearing.

Similar to what occurred in *Dietrich*, the statements I made at the *Nelson* hearing were directly attributable to my concern as Chief Judge, the same concerns held by other members of our Court, at having to deal with what can only be described as the excessive, frivolous filings by Mazzei that were bogging down our dockets and threatening the new LMP and for which he later routinely sought compensation in baseless fee applications. Some of the comments in *Nelson* also referred to the "expense retainer" matter noted earlier.

To the extent it can even be characterized as such, the most "incendiary" language appearing in the *Nelson* hearing statements cited by Mazzei would seem to be my comment that he was filing "garbage," and that he may have been guilty of negligence /malpractice. Although harsh, those terms were clearly justified.

The term "garbage" was used to refer in general to filings such as LMP applications in cases where they should not have been filed since not legally eligible. It also referred to the "stipulation" with the bank that Mazzei had filed in *Nelson* itself calling for the LMP to go forward when, only a few minutes later that same date, he then filed a notice indicating the debtor wished to withdraw from the LMP – two, nearly simultaneous but contradictory filings, which in my view can accurately be characterized as garbage. The terms negligent and "malpractice' were used to describe

21

the apparent state of affairs in Mazzei's office pursuant to which non-lawyers were making legal decisions about whether LMP applications should be filed in particular cases.   Based on the reasoning as set forth in the *Liteky* case, clearly the Court is justified in expressing its state of mind on this topic without becoming subject to recusal.

### 4.  Keith, Case No.  09-12278 (Motions Par. 3(d))

The final statement made by the Undersigned that the *Motions* point to as evidence of bias or prejudice arose during a hearing in the *Keith* case, also on March 14, 2013, held to consider Mazzei's request for yet another LMP time extension.   Again, the *Motions* accurately set forth the statement from the hearing.   Beyond that, there is really not much more to say.   The Court sees nothing in the statement which might conceivably be viewed as evidencing bias or prejudice under even the most expansive view of those concepts.   The statement was simply a critique as to the way Mazzei assigned multiple office personnel to handle individual LMP matters – a critique which the Court noted applied equally to Bank of America, also represented at the hearing.

### 5.  Orders to Show Cause (Motions Par. 4)

In Paragraphs 4 of the *Motions* it is contended that I issued an "unprecedented" number of orders to show cause directed against *Mazzei* since the *Cihon* hearing, whereas other judges of the Court issued none against him during the same time period.   The Movants apparently conclude that  the alleged discrepancy provides evidence that I harbor a bias against Mazzei.

22

As an initial comment, it can be stated that this contention is factually incorrect. For instance, just recently in *Linkel,* Case No. 10-27856, Judge Taddonio issued an order to show cause against Mazzei to consider whether sanctions should be imposed against him over a fee-related matter. *See*, Doc. No. 64. Judge Taddonio held a hearing in the matter on May 1, 2014 but has yet to finally rule on that OTSC. Leaving the factual inaccuracy aside, it is in any event difficult to weigh this factor because Mazzei has provided no detail whatsoever to support it, Paragraphs 4 of the *Motions* being more in the nature of anecdotal evidence than anything else. The Court nevertheless took the trouble itself to run a report for the last two years comparing the actual numbers on orders to show cause issued by the various judges of the Court. The numbers show that I do issue such orders far more, in general, than my colleagues on the Bench. Possibly, it is because this is a proactive approach I take in my cases in these types of matters and do not hesitate to issue such orders when I believe it to be necessary. Other judges may have a different way of handling their caseload. But probably more telling is that I use the term "OTSC" when some of my colleagues do not.

For instance, while Chief Judge Deller recently scheduled what I would call show cause hearings in the matters of *Griffin*, Case No. 11-27332, and *Kaluszny*, Case No. 06-25696, he simply referenced those matters as "hearings" yet the orders scheduling those hearings were essentially "orders to show cause." Both final hearings were held in March of this year and involved allegations of misconduct against Mazzei regarding handling of client funds and unauthorized fee charging. In *Kaluszny*, based on the allegations made, Chief Judge Deller found favorably for the Debtor and issued a sanction against Mazzei as a result, i.e., he directed the Chapter 13 Trustee to

report Mazzei to the Pennsylvania Disciplinary Board if on further review his misconduct merited

such a referral.

Regardless, I make no apologies for my approach and only point it out to demonstrate

that even were it true to say that I have issued OTSCs against Mazzei while other judges have not

(which as noted above is not actually the case) that in itself would mean very little. Misconduct

claims were raised against Mazzei and made directly to me in my capacity as Chief Judge and I acted

on those complaints. I was in charge of the LMP where Mazzei filed upwards of 460 cases in which

he was seeking upwards of $460,000 in fees but admittedly did little to no work in those cases. I

denied fees approaching $300,000 as a direct result of the orders to show cause I entered against him.

Unless the Movants can point to some specific OTSC that I have issued against Mazzei that was

baseless – something they have not done – I find this purported instance of bias to carry no weight.

### 6.  *Personal Knowledge of disputed facts (Motions Par. 7-10)*

The final reason advanced by the Movants as to why I should recuse is not based on

bias or prejudice, but rather the contention that I have personal knowledge of disputed evidentiary

facts. The basis for this argument is that I have been provided with knowledge through alleged off-

the-record and *ex parte* communications with the expert that was appointed pursuant to the Consent

Order.

The Consent Order that Mazzei signed clearly states that he was agreeable to

"involving an outside person appointed to investigate and report back to the Court." It also clearly

24

states that after the expert was appointed the "Court will communicate" with the expert to set forth

in detail exactly what the Court expected him to investigate, and the expert will report back to the

Court with findings and recommendations.

The Consent Order also recognizes that the expert's report could "prompt the Court

to take further action," so clearly it was contemplated that there might well be further proceedings

following the issuance of the report.  For the Movants  to now  challenge my ability to serve in this

matter on the basis of "personal knowledge" runs directly counter to Mazzei's agreement and

voluntary entry into the Consent Order.

At the time of entering into the Consent Order,  Mazzei ostensibly understood and

agreed that the expert was being appointed for the specific purpose of conducting an inquiry and then

reporting back to this Court.  He signed the Consent Order with the advice of counsel.

Even leaving that issue aside, this point in the *Motions* is problematic in other

respects.  First, it is not at all clear that the "personal knowledge" referred to in *Section 455(b)(1)*

would even encompass any information I may have obtained from the expert report, or even speaking

with the expert.  Case law is clear that *Section 455(b)(1)* is aimed only at personal knowledge of

disputed facts that a judge may have learned outside of the judicial proceeding.  *See, e.g., U.S. v.*

*Bernstein*, 533 F.2d 775 (2d Cir. 1976) (knowledge gained by a judge while acting in the judicial

capacity is not the kind of matter that results in a disqualification).  The expert was appointed as part

of a judicial proceeding and any communication I have had with him concerning this matter – which

has been minimal in that almost all such communication has been through Chambers' staff – has

likewise been as part of such proceeding.

Second, I actually already possessed a great deal of knowledge concerning Mazzei and his operations even before the expert was appointed based on my direct experiences with him in numerous matters. That is why I directed the appointment of an expert as part of the Consent Order in the first place. While the expert may have filled in some details in his report, the broad outline was already well known to me. Of the 44 discrete issues of concern set forth in the OTSC entered in Misc. No. 14-205, only 10 involve the expert. And most of those issues involve matters of which the Court had prior knowledge.

Finally, and not unexpectedly, the *Motions* seem to betray a fundamental misunderstanding of the status of this proceeding and seem to indicate a belief that the OTSC that was issued against Mazzei in Misc. No. 14-205 starts out with some kind of presumptive blank slate, needing all the facts filled in. That is simply not true.

In large part much of the factual predicate has already been established, and the primary purpose of the OTSC in Misc. No. 14-205 is to determine whether Mazzei should be subject to any further disciplinary consequences. Although Mazzei has filed a request for evidentiary hearing in which he purports to have a factual dispute with every single point set forth in the OTSC, the Court simply does not believe he can do so in good faith given the findings that have been made by the Court and the admissions that have been made by him in this and in previous matters.

To take just one example, Mazzei states that there is a factual dispute concerning his collection of the expense retainers of up to $950. See the *Request for Evidentiary Hearing* at ¶3(B)(a), Doc No. 12. But he has admitted on several occasions to doing just that, including at some

of the very hearings cited in the *Motions* to recuse. He may have a legal argument that he should not be disciplined for doing so, but the Court cannot see how he can in good faith claim there is a factual dispute about it.

### *DISCRETIONARY RECUSAL*

As a result of all the foregoing, at this time, on this factual record, it does not appear to the Court that there is a sufficient cause requiring my recusal pursuant to *28 U.S.C. §455* on the basis of an appearance of lack of impartiality due to bias or prejudice against Mazzei, or because of personal knowledge of some disputed factual issues. Therefore, in the vacuum of this particular record, as a matter of law, the *Motions* should be denied for the reasons stated. However, in the Undersigned's mind, that is not the end of the matter.

Even though a judge may not be statutorily required to recuse and should not recuse unnecessarily, the decision to recuse is one personal to the judge considering it and a matter committed to the sound discretion of the court weighing its recusal options. *See, e.g., U.S. v. Wilensky*, 757 F.2d 594, 599 (3r Cir. 1985), *U.S. v. Solomon*, 2013 WL 474532 *2 (W.D.Pa. Feb. 7, 2013). This is because the judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion. *U.S. v. Ciavarella*, 716 F.3d 705, 720 (3d Cir. 2013), *DaSilva Moore v. Publicis Groupe*, 868 F.Supp. 2d 137, 150 (S.D. N.Y. 2012) (quoting *In re Drexel Burnham Lambert, Inc.*, 861 F.2d 1307 (2d Cir. 1988)). The trial judge's decision on recusal will not be reversed absent an abuse of discretion. *Wilensky, supra.*

If no statutory basis for recusal has been shown, typically recusal will be denied to prevent the possibility of "judge shopping" and in recognition of a judge's general duty not to recuse if there is no reasonable basis to question his impartiality. *DaSilva, supra*; *Lynch v. City of Philadelphia*, 2009 WL 1424489 *1 at fn. 3 (E.D. Pa. 2009).

Despite this, it is also clear that exceptional circumstances can exist in which a judge may elect to discretionarily recuse even though no statutory basis for doing so has been demonstrated. *See, e.g., Haas v. Pittsburgh National bank*, 82 F.R.D. 457 (W.D. Pa. 1979) (court discretionarily recused itself where two petitioners in matter before him tried to use the news media to intimidate him), *Horrocks v. Daggett County*, 460 F. Supp. 2d 1274, 1288 (D. Utah 2006) (court discretionarily recused itself because of involvement in settlement discussions), *Welch v. Artus*, 2007 WL 949652 * 25 (W.D.N.Y. March 29, 2007). *See also Caperton v. A.T. Massey Coal Company, Inc.*, 556 U.S. 868, 901 (2009) (in best of all possible worlds, judges should sometimes recuse even where not required to do so; Scalia J., dissenting).

I was appointed by Chief Judge Deller to, in effect, represent the interests of the entire Bankruptcy Court for the Western District of Pennsylvania in all these matters involving Mazzei once the extent of his apparent misconduct became so widespread, and the UST as "watch dog" of

28

the bankruptcy system inexplicably chose not to involve herself.[8]  As previously noted, this

proceeding is unique in that in no event would I conclude this matter by making a final decision in

the case.  Rather, I was directed only to render a report and recommendation to Chief Judge Deller,

who will then act himself, or in conjunction with all of the Bankruptcy Court judges to make a

decision. It might be argued that unique circumstance would require an even more relaxed view of

recusal when compared to a more strict approach in the typical case where a recusal issue is raised.

Judges by their nature tend to take a proprietary interest in handling their cases

through to final resolution.  That tendency is heightened when litigants file recusal motions

questioning their impartiality where no apparent cause is shown requiring recusal.  This is especially

so when the recusal motion is filed late in the proceedings – the tactic having the appearance of a

litigation ploy designed to avoid the inevitability of the adverse consequences of the judge's

continued involvement in the case more than raising legitimate legal issues.

---

[8]        For a discussion of the UST as watch dog of the system, see n. 5, *supra*.  It must also be
noted that even after the Court filed Misc. No. 14-205 and thus unmistakably made known its own concerns
about Mazzei's conduct having a negative effect on the bankruptcy system as a whole, the UST's
involvement has been minimal.  The UST's representative has been copied on all significant orders in both
Misc. Nos. 13-203 and 14-205, and her participation in the process has been invited. *See, e.g.,* Doc. No. 18
in Misc. No. 13-203, at Order dated April 7, 2014, stating that the Office of the United States Trustee could
file a response to the *Motion to Approve Joint Stipulation* filed by Mazzei and McElrath that would permit
the Chapter 13 Trustee to make ongoing plan fee payments in Mazzei cases to McElrath. Doc. No. 18 sets
forth a series of serious issues raised by the proposed fee transfer that the Court assumed would have been
of extreme interest to the UST in her watchdog role because they implicate the integrity of the bankruptcy
system.  However, for whatever reason, the UST chose not to file any response, nor did she have anyone
appear on her behalf at the April 29, 2014 hearing on the matter before the Undersigned, or the May 30, 2014
hearing on the matter before Judge Taddonio.  Similarly, the UST did not appear for the hearing on the
*Motions* themselves held on May 28, 2014.  In fact, the only active involvement by the UST before the
Undersigned in either of these two Miscellaneous Matters has been an objection she filed in opposition to
Mazzei's motion seeking to file under seal his response to the OTSC in Misc. No. 14-205. *See* Doc. No. 9.
While that filing relates to an important issue and the Court was encouraged to finally have some action and
involvement emanating from the Office of the UST in these very important matters, in the overall picture,
her lack of involvement has been a disappointment to the Court.

Nevertheless, after careful consideration, I have reluctantly come to the conclusion that the best course is for me to discretionarily recuse myself. I have reached this conclusion not for any of the reasons stated in the *Motions*, and not because of the statutory requirements, but because I believe to do so will be for the greater good of the Court as a whole. There are several reasons that have led me to his result.

For one thing, the course these proceedings have taken and the lack of active involvement by the UST have put me in something of a dual role – of necessity functioning as both Judge and in certain respects as something akin to a "prosecutor."[9]  While this circumstance has in essence been forced upon me, and is not of itself disqualifying, it is obviously not ideal and a discretionary recusal may be beneficial in that regard because a new judge will not have been involved in the foundation established to date.

Another reason relates to the rather unique nature of this case and the significance of it to the entire bankruptcy system of this District.  I am not willing to permit the distraction of a collateral issue related to the alleged legitimacy of one judge, and thus, by extension the entire process embodied in these two Miscellaneous Matters, to further intrude into the time and resource of the Court. *See, e.g., U.S. v. Al Bahlul*, 807 F.Supp. 2d 1115, 1123 (USCMCR 2011).

---

[9]     Out of practical necessity, the Court routinely acts in a role that might be likened to a "prosecutor" when it issues orders to show cause or similar motions that function in the manner of a "bill of particulars," requiring attorneys to appear and defend themselves against the "charges." However, these are typically discrete matters, with simple facts, where the outcome is likely to be at worst an admonishment, a relatively small monetary sanction or an award of attorney's fees. The present matter, in sharp contrast, involves factual issues of a much broader scope potentially resulting in a very severe sanction including the loss of the right to practice in this Court.  In these circumstances, to the extent possible, it would be preferable to keep the adjudicatory and prosecutorial functions separate.

There is also the possibility that, were I to deny the *Motions* and remain in the case, the unfounded allegations of bias and improper personal knowledge raised by the Movants, meritless as they may be, could nevertheless be used by the Movants in an effort to somehow taint the legitimacy of the proceedings, something that could affect the entire process. There is also a good chance that the Movants would seek to have a denial of the *Motions* reviewed by an appellate court. This conceivably could delay justice (and therefore deny it) for upwards of 6 to 8 months if not more. Although I am confident such an appeal ultimately would not be successful, as a practical matter it would result in a potentially lengthy delay in a case that clearly needs prompt resolution.

One final factor that has weighed on my consideration is the fact that the proceedings involving Mazzei have to some extent entered the public consciousness through news coverage. The public perception of the integrity of the process is important, but obviously it cannot be expected that the public will have the full benefit of all the numerous relevant details when it learns about the recusal decision. In these circumstances, in order to guard against any possible misperception, I find it best to err on the side of caution by discretionarily recusing myself.

### *CONCLUSION*

In determining whether to exercise discretionary recusal in this case, I have weighed heavily the countervailing circumstances that might delay this matter coupled with the urgency of resolving the current situation that affects so many cases and litigants in this Court caused by the numerous and overwhelming instances of Mazzei's misconduct. While exhaustively and carefully

balancing my responsibility not to unnecessarily recuse myself, and as personally distasteful as it

may be, I find that for the greater good of the Court as a whole and the practice of bankruptcy in the

Western District of PA, generally, it is best that I recuse myself from further involvement in Misc.

Nos. 13-203 and 14-205.[10]    Accordingly, I will ask Chief Judge Deller to assign these matters to

another member of the Court.

       An appropriate order follows.

Dated: June 9, 2014

       Thomas P. Agresti, Judge
       United States Bankruptcy Court

Case administrator to serve:
    Chief Judge Jeffery A. Deller
    Hon. Carlota M. Böhm
    Hon. Gregory L. Taddonio
    Joel Dresbold, Esq.
    Jason Mazzei, Esq.
    Paul V. McElrath, Esq.
    Ronda Winnecour, Esq.
    Joseph Sisca, Esq.

---

[10]    The discretionary recusal I am exercising at this juncture in Misc. No. 14-205 extends only
to the directive to conduct an inquiry and make a report and recommendation to Chief Judge Deller.  In his
Order opening this matter, Judge Deller stated that he may convene a meeting of the Judges of the Court to
consider further disciplinary sanctions against Mazzei after he receives such report and recommendation.
The *Motion* in Misc. No. 14-205 did not ask that I recuse from that potential future aspect of the proceeding
and I have not considered it here.