IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Misc. Pro. No. 14-00205-GLT |
| | : | |
| MATTERS INVOLVING THE | : | |
| PROFESSIONAL CONDUCT OF | : | |
| JASON J. MAZZEI, ESQ. and | : | |
| d/b/a MAZZEI & ASSOCIATES IN | : | Related to Dkt. No. 140 |
| MATTERS BEFORE THE COURT | : | |
| | : | |

## <u>MEMORANDUM OPINION</u>

At what point is disbarment an inadequate remedy for attorney misconduct?  The Court must grapple with that question in this case.  Attorney Jason J. Mazzei, the subject of these disciplinary proceedings, stands accused of numerous acts of impropriety, including the misuse of over $100,000 in client retainers.  To resolve the charges against him, Mazzei now offers to voluntarily consent to disbarment.[1]  Given the numerous debtors affected by Mazzei's actions, the Court finds that disbarment is not enough.  Based upon the record, Mazzei collected upwards of $950 each from hundreds of clients as an "advance" against expenses incurred in their cases.  Mazzei pocketed these monies without any intention of reconciling the retainer against his actual expenses or returning the excess to his clients.  Disbarment, on its own, allows Mazzei to profit from any wrongdoing by keeping the unearned retainers at the expense of bankrupt individuals who can least afford it.  The Court cannot approve a resolution that ignores

---

[1]     <u>See</u> *Consent Motion for Approval of Settlement of Matters Relating to Jason J. Mazzei* filed by the Office of Disciplinary Counsel ("<u>ODC</u>") of the Disciplinary Board of the Supreme Court of Pennsylvania (the "<u>Disciplinary Board</u>").  [Dkt. No. 140].  Through the *Consent Motion*, the ODC proposes to resolve all pending misconduct allegations against Mazzei in exchange for his consent to disbarment from the practice of law in both the United States District Court and the United States Bankruptcy Court for the Western District of Pennsylvania.

Mazzei's responsibility to make whole any person injured by his misconduct. For this reason, the proposed settlement is denied.

## I.

The professional conduct of Jason J. Mazzei is at issue in this case. Until he sold his practice in September 2013, Mazzei and his firm, Mazzei & Associates, controlled one of the largest consumer bankruptcy practices in this District. To avoid unnecessary duplication in the recitation of the factual background, the Court incorporates its prior findings from In re Mazzei, 522 B.R. 113 (Bankr. W.D. Pa. 2014).

While his firm produced a high volume of bankruptcy filings, Mazzei's practices were questionable. After witnessing his conduct for itself and receiving several client complaints of overbilling and other misconduct, the Court developed serious concerns regarding the propriety of Mazzei's practices. Chief Judge Jeffery A. Deller commenced this miscellaneous proceeding for the purpose of determining whether disciplinary measures should be imposed against Mazzei "for an overall and/or systemic pattern of professional misconduct in matters before this Court[.]" [Dkt. No. 1].

The matter was initially referred to Judge Thomas P. Agresti who issued an *Order to Show Cause* containing a *"List of Particulars"* identifying the specific allegations of misconduct that formed the basis of the Court's inquiry. [Dkt. No. 3].[2] The *List of Particulars* includes charges that Mazzei routinely overbilled clients, filed false or altered statements with the Court, absconded with thousands of dollars in unused

---

[2]    On June 9, 2014, Judge Agresti recused himself from the proceeding as a matter of discretion, and Judge Deller subsequently assigned this matter to the undersigned. [Dkt. Nos. 37-39].

expense retainers, and indiscriminately pursued hundreds of loss mitigation cases without regate to whether such relief would benefit his clients.  Mazzei contested the allegations contained within the *List of Particulars* and requested an evidentiary hearing.  [Dkt. No. 11; see also Dkt. No. 35].

During the pendency of this case, the Court was presented with a number of ancillary issues to untangle.  First, Mazzei transferred his law practice to another attorney thereby necessitating a ruling from the Court as to whether a sale of the practice had occurred.  Next, Mazzei filed several appeals challenging the Court's ability to adjudicate this proceeding.[3]  Lastly, the Office of the United States Trustee declined to take an active role in this matter.  To fill the void left by the Trustee, the Court issued a *Report and Recommendation* to the District Court seeking the appointment of legal counsel to investigate and prosecute the allegations of misconduct against Mazzei.  [Dkt. No. 98].  By *Order* dated November 25, 2014, Chief Judge Joy Flowers Conti appointed the ODC to serve in a prosecutorial capacity in these proceedings.  [Dist. Ct. No. 14-00568, Dkt. No. 2].

During this time, Mazzei's license to practice law was suspended for three years by the Supreme Court of Pennsylvania due to infractions unrelated to this miscellaneous proceeding.  Thereafter, the Trustee re-emerged to file a motion seeking approval of a "settlement" in which the entire miscellaneous proceeding would be

---

[3] Mazzei filed two appeals related to this miscellaneous proceeding.  Two additional appeals were filed regarding Misc. Pro. 13-00203-GLT.  The District Court dismissed each of the four appeals. Mazzei v. No Respondent, Dist. Ct. Civ. A. Nos. 14-01471 and 14-01649, Dkt. Nos. 6 and 6 (W.D. Pa. Jan. 13, 2015); Mazzei v. Winnecour, Dist. Ct. Civ. A. Nos. 14-01720 and 15-00009, Dkt. No. 8 and 4 (W.D. Pa. Apr. 15, 2015).

resolved in exchange for Mazzei's agreement to a three-year suspension of practice before the Bankruptcy Court and District Court.    [Dkt. No. 100].    The three-year suspension proposed by the Trustee would run concurrently with the state court suspension.

At a status conference held on December 2, 2014, the Court questioned the Trustee as to how the proposed "settlement" addressed the allegations contained within the *List of Particulars*.  Because the Court recognizes the disciplinary actions of other tribunals as a matter of reciprocity, Mazzei would have been suspended for three years irrespective of any "settlement" with the Trustee.[4]  The Court therefore failed to see how the Trustee's proposal would remedy the alleged misconduct which gave rise to this matter or redress any harm sustained by Mazzei's clients.[5]   While the Court did not rule out a settlement in concept, it stressed that any resolution must correlate to the allegations in this miscellaneous proceeding rather than bootstrap the disciplinary proceedings pending in another jurisdiction.

The Trustee withdrew her motion on January 29, 2015.  The Court then gave the ODC the opportunity to thoroughly familiarize itself with the miscellaneous proceeding and the specific allegations of misconduct.  On February 13, 2015, the ODC proposed its *Consent Motion*.  This settlement agreement proposed the disbarment of Mazzei, retroactive to the date the three-year suspension took effect.

---

[4]    Indeed, the District Court and Bankruptcy Court each entered Orders suspending Mazzei for three years as reciprocal discipline related to the suspension issued by the Supreme Court of Pennsylvania.  [Dkt. No. 114; <u>see</u> <u>also</u> Dist. Ct. Civ. A. No. 14-00056, Dkt. No. 3].

[5]    In making these comments, the Court specifically referenced sections A.7, A.15, B.4, B.5, B.8, F.1, and H.2 of the *List of Particulars*.  [Dkt. No. 3].

Upon a thorough review of the *Consent Motion*, the Court identifies similar problems to those presented in the Trustee's "settlement." The *Consent Motion* does not address the specific allegations contained within the *List of Particulars*, nor does it provide a procedure to remediate any harm caused to Mazzei's clients. Rather, the ODC seeks approval of the *Consent Motion* on the basis that, for five years, disbarment represents the "ultimate consequence" for Mazzei's wrongdoing.[6]

To be sure, disbarment is a significant sanction. It represents the highest professional price a lawyer can pay for his transgressions. In this case, the forfeiture of Mazzei's law license would address a significant number of issues prompted by the *List of Particulars*. Among other allegations, Mazzei is accused of numerous instances where his honesty and candor to the Court have been challenged. He allegedly manipulated or

---

[6] Rule 218 of the Pennsylvania Rules of Disciplinary Enforcement provides that "[a] person who has been disbarred may not apply for reinstatement until the expiration of at least five years from the effective date of the disbarment. . . ." Pa. R.D.E. 218(b).

It is acknowledged that disbarment represents the maximum penalty the ODC can recommend. The Court, however, is not subject to such limitations. A federal court has plenary power over the discipline of attorneys who practice before it. Matter of Abrams, 521 F.2d 1094, 1099 (3d Cir. 1975), cert. den., 423 U.S. 1038, 96 S.Ct. 574, 46 L.Ed.2d 413 (1975); see also Chambers v. NASCO, Inc., 501 U.S. 32, 43 (1991); In re Corn Derivatives Antitrust Litig., 748 F.2d 157, 160 (3d Cir. 1984) ("One of the inherent powers of any federal court is the admission and discipline of attorneys practicing before it."). Section 105(a) of the Bankruptcy Code likewise vests the bankruptcy court with authority to issue any order necessary to enforce the requirements of the Bankruptcy Code or to avoid an abuse of process. See 11 U.S.C. §105(a); In re Gray's Run Techs., Inc., 217 B.R. 48, 53 (Bankr. M.D. Pa. 1997) (section 105(a) power may be used to regulate the conduct of officers appearing before the court). The Court's power to disgorge fees is also well established. See 11 U.S.C. § 329(b)(1); In re Lewis, 113 F.3d 1040, 1045 (9th Cir. 1997). Thus, a panoply of remedies are at the Court's disposal to address instances of attorney misconduct. The Court may therefore consider disbarment while simultaneously imposing additional sanctions (including restitution) which may be warranted under the circumstances of the case. See In re Seare, 515 B.R. 599 (9th Cir. BAP 2014) (bankruptcy courts have express authority to sanction attorneys and enjoy wide discretion to determine the extent of the sanction); In re Greco, 246 B.R. 226 (Bankr. E.D. Pa. 2000). In this particular matter, the District Court authorized the Court to make all determinations and to enter such orders as it deems necessary and appropriate to address the Mazzei's alleged conduct. See In re Discipline of Jason Joseph Mazzei, Dist. Ct. Misc. No. 14-00568, Dkt. No. 2.

redacted documents filed with the Court, made repeated misrepresentations to the Court, and pursued loss mitigation in hundreds of cases without investigating whether such relief would benefit his clients.[7]   More recently, Mazzei acknowledged that he practiced before the Bankruptcy Court for at least seven years before he was formally admitted to the bar of the District Court.  [Dkt. No. 115].  Disbarment undoubtedly addresses the overriding issue of Mazzei's integrity by prohibiting him from practicing law, thereby eliminating the prospect of additional infractions in the future.

The miscellaneous proceeding presents more than matters of integrity before a tribunal, however.  A substantial portion of the *List of Particulars* is devoted to whether Mazzei mishandled client funds, including his long-standing practice of collecting a prepetition expense retainer of up to $950 per case.[8]   Mazzei required the retainer from his clients as an advance against the out-of-pocket expenses he incurred during a bankruptcy case.[9]   For years Mazzei neglected to reconcile the expense retainers against his actual costs because he did not maintain a running tally of expenses.  By failing to compile an expense itemization, Mazzei evaded his obligation to refund the unused portion of the retainer whenever the actual costs were less than the amount paid

---

[7]      See *Order to Show Cause* ("List of Particulars"), Dkt. No. 3, at E.2, E.3, H.4, and H.5

[8]      See *List of Particulars*, at A.7, A.15, B.4, B.5, B.8, and H.2.

[9]      Mazzei routinely collected a second, but smaller, retainer (less than $500) which was applied against the legal fees earned in a case.  Pursuant to his fee agreement, Mazzei charged a minimum legal fee (known as the "base fee") for representation of a debtor in a chapter 13 proceeding.  The base fee appears to align with the "no-look" fee established by this Court, which is the maximum legal fee an attorney can receive in the absence of an approved fee application.  See W.PA.LBR 2016-1(f).

by the client.  As a result, Mazzei kept the money and clients who may have been entitled

to a refund never received one.  See supra at Part II.

The Court is keenly focused on these retainer issues because they involve

potential financial injury to third parties on a scale of immense magnitude, both

individually and collectively.  Mazzei began the practice of collecting an expense retainer

as early as 2008.[10]  By January 1, 2013, he had approximately 1,500 chapter 13 cases

pending in this Court.[11]  Assuming that an expense retainer of at least $900 was paid in

each case, Mazzei received an aggregate of approximately $1,350,000 in client funds for

which he failed to maintain an accounting.  The impact is no less significant on the

individual level since bankruptcy debtors, who already face a host of financial pressures,

may have been deprived of funds that rightfully belong to them.  Unlike the "integrity

issues" for which any damage is largely confined to his reputation, the "monetary issues"

reach far beyond Mazzei, requiring the Court to insist upon a solution that addresses all

who may have been adversely impacted by this conduct.

Mazzei does not dispute that he failed to keep contemporaneous expense

records or provide expense reconciliations to his clients.  In support of the *Consent

Motion*, Mazzei defends his actions on several fronts.  He initially argues that it is

---

[10]     Evidence of the expense retainers first appeared on the Court docket in 2008, but the practice may
have begun prior to that.  See In re Owens, Bankr. Case No. 08-12242-TPA, Dkt. No. 6, at ¶ 9 of
the *Statement of Financial Affairs*.

[11]     This statistic was calculated on July 1, 2015 by totaling all chapter 13 cases in which Mazzei &
Associates was listed as counsel of record in the Court's CM/ECF system as of January 1, 2013.

Because the term of a chapter 13 plan cannot exceed five years, substantially all of the cases
pending on January 1, 2014 would have been commenced after Mazzei began collecting the
expense retainer.

extremely difficult to account for costs in a chapter 13 case because postage, copy charges, PACER fees, and other expenses continually accrue on a daily basis. To the extent expenses are accurately tracked, he contends the retainer is insufficient to cover all costs incurred during a typical chapter 13 case, especially when the case reaches a successful conclusion.[12] When actual expenses fall short of the amount advanced by the client, Mazzei claims he is able to apply the unused portion of the retainer against his unpaid legal fees.[13] Lastly, Mazzei resorts to the "everybody is doing it" defense. He asserts that the practice of collecting an expense retainer is utilized by most practitioners within this District. He complains that he is being "targeted" for these offenses while other attorneys are not held accountable for employing similar practices.

Since each of Mazzei's defenses involve undisputed facts or invoke questions of law, the Court can render a determination without further evidence, even to the extent the defenses may go to the underlying merits of this proceeding. Within this context, the Court will address Mazzei's arguments in turn.

## II.

To understand the significance of these concerns, the Court must first review the legal requirements for retainers in the context of a bankruptcy proceeding. Retainers are commonly classified into two broad categories. In re Renfrew Center of Florida Inc., 195 B.R. 335, 338 (Bankr. E.D. Pa. 1996). A "classic" retainer involves a fixed payment for the right to utilize the lawyer's legal services. Id. Because it is fully

---

[12]      Id. at B.2 and F.1.

[13]      Id. at ¶ 7 and B.2.

earned upon payment, the classic retainer is not refundable.  Id.  By contrast, a "special"

retainer involves the payment of funds for a specific service and the client retains an

interest in the retainer if the contemplated services are not provided.  See Ryan v. Butera,

Beausang, Cohen & Brennan, 193 F.3d 210, 216 (3d Cir. 1999).  Special retainers exist in

two varieties.  A "security" retainer is held by an attorney to secure payment of future

services, while an "advance fee" retainer is depleted by the attorney as services are

rendered.  Renfrew, 195 B.R. at 338.  These retainers differ in terms of who holds the

ownership interest in the funds.  Under a security retainer, the client retains an ownership

interest until the attorney applies the funds against her approved legal fees.  Id.  With

respect to an advance fee retainer, ownership of the funds generally passes to the attorney

at the time of payment.  Id. at 338-39.

Mazzei's fee agreement features retainers of each primary type.[14]  The

legal fee retainer constitutes a "classic" retainer.  It is a "non-refundable" amount applied

---

[14]    See Exemplar of Mazzei Fee Agreement (the "Fee Agreement"), In re Stranburg, Bankr. Case No.
10-12009-TPA, Dkt. No. 67, at Exhibit A, section 1.  The Court previously found the 12-page Fee
Agreement to be an "onerous" and "difficult to understand" legal document that discourages a
careful reading of its contents by non-lawyers.  See In re Linkel, Bankr. Case No. 10-27956-GLT,
Dkt. No. 55.

against the "base fee" for standard legal services rendered in the chapter 13 case. *Fee Agreement*, at section 2. The base fee represents the minimum charge for legal services and may be payable irrespective of whether the case reaches a successful conclusion. Id. at section 4. Although classic retainers are generally disfavored in bankruptcy because they facilitate the payment of fees without court oversight,[15] Mazzei's fee retainer did not trigger significant concern as it was typically less than $500 and always fell below the "no-look" amount authorized by the Court.

The expense retainer is entirely different. Recognizing that "it is difficult to determine the actual amount of fees and expenses that will be expended" on a case, the *Fee Agreement* requires clients to tender a deposit that will satisfy out-of-pocket costs incurred during the course of the representation. *Fee Agreement*, at section 1. While the *Fee Agreement* clearly states that the legal fee retainer is non-refundable, the *Fee Agreement* is devoid of any clear or unambiguous language indicating that the same is true with respect to the expense retainer. To the contrary, the *Fee Agreement* mandates a reconciliation of the expense retainer against the actual costs incurred, and requires any overpayment to be credited to the client:

> In the event that the fees and expenses stated herein exceed the actual amount expended, then we will seek reimbursement of these funds. **In the event that fees and expenses do not total the amount stated herein, then any overpayment will be applied toward your legal fee.**

---

[15]    See, e.g., In re Pannebaker Custom Cabinet Corp., 198 B.R. 453 (Bankr. M.D. Pa. 1996); In re NBI, Inc., 129 B.R. 212, 223 (Bankr. D. Colo. 1991); In re Dearborn Const., Inc., No. 02-00508, 2002 WL 31941458 (Bankr. D. Ida. 2002).

*Fee Agreement*, at section 1 (emphasis added).  The *Fee Agreement* also directs that an itemization be provided to the client and the Bankruptcy Court whenever the sum total of fees and expenses exceed the amount of the base fee.  Id. at section 4.  Based upon the language used in the *Fee Agreement*, the expense retainer constitutes a "special" retainer upon which a client holds the right to obtain a refund.

Mazzei has not satisfied his burden of establishing which special retainer classification the expense retainer may fall within.  For the purposes of this *Memorandum Opinion*, it is a distinction without a difference.[16]  While security retainers and advance fee retainers may differ as to whether the funds are "client owned," they both share a common principle that an attorney may not permanently keep special retainer funds to the

---

[16]     Although not dispositive at this stage, the distinction between "security" and "advance fee" retainers may later prove significant because it defines the obligations Mazzei owes to his clients regarding the safekeeping of such funds.  Lawyers are required to maintain client property separate from their own property.  Pa. R.P.C. 1.15(b).  Client funds should be deposited into a lawyer's trust account, only to be drawn down as earned and approved.  See Pa. R.P.C. 1.15(b) cmt. 7.  As recent amendments to the explanatory comments make clear, a lawyer may not deposit client funds into a general operating account without the written consent of the client:

> With little exception, funds belonging to a client or third party must be deposited into a Trust Account . . . and funds belonging to the lawyer must be deposited in a business operating account. . . .  [U]nless the client gives informed consent, confirmed in writing, to a different manner of handling funds advanced by the client to cover fees and expenses, the lawyer must deposit those funds into a Trust Account . . . .

Pa. R.P.C. 1.15(b) cmt. 2.  Notwithstanding these provisions, some courts have demanded a heightened level of protection for advance fee retainers, requiring that all such funds be deposited into a trust account to guard against overreaching by lawyers.  See, e.g., Gray's Run, 217 B.R. at 57; In re Kinderhaus Corp., 58 B.R. 94, 97 (Bankr. Minn. 1986); In re Printing Dimensions, Inc., 153 B.R. 715, 720-21 (Bankr. D. Md. 1993).

Mazzei acknowledges that he placed the expense retainers in his general operating account.  See *Response*, at F.1 and F.2; see also *Report of the United States Trustee in Response to Order of Court* ("UST Report"), In re Doughty, Bankr. Case No. 11-27013-TPA, Dkt. No. 516.  Whether this practice violates Mazzei's ethical obligation to his clients is a matter the Court may consider at another time.

extent they are unearned.   See In re Gray's Run Techs., Inc., 217 B.R. 48, 56 (Bankr.

M.D. Pa. 1997) (upon termination of the representation, an unearned retainer must be

returned to the source, regardless of whether it resides in the lawyer's operating account

or counsel's trust account).   The duty to refund an unearned retainer arises out of the

Pennsylvania Rules of Professional Conduct which requires:

> Upon termination of representation, a lawyer shall take steps to the
> extent reasonably practicable to protect a client's interests, such as .
> . . surrendering papers and property to which the client is entitled
> and refunding any advance payment of fee or expense that has not
> been earned or incurred.

Pa. R.P.C. 1.16(d).   A lawyer is required not only to promptly deliver funds to the client,

but he must also "promptly render a full accounting regarding the property[.]"  Pa. R.P.C.

1.15(e).

Based upon the record before the Court, Mazzei neither adhered to the

requirements of the Pennsylvania Rules of Professional Conduct, nor complied with the

terms of his own *Fee Agreement*.[17]   Mazzei neglected to maintain a running tally of

expenses incurred in each of his cases.[18]   He also disregarded his obligation to perform a

---

[17]     As a matter of practice, M&A did not maintain separate ledgers for each client file.   See, *UST Report*, at ¶ 5 ("Separate ledgers are not maintained in Quick Books for each case or individual file.   Instead, all financial transactions are recorded without identifying information or transaction codes, such as bankruptcy case captions or numbers.").   This led the United States Trustee to conclude that M&A's internal accounting procedures failed to comply with Professional Rule 1.15(c)(2).   Id. at ¶ 9.

[18]     See In re Linkel, Case No. 10-27856-GLT, Hearing Held in Courtroom A, May 1, 2014 (11:46 a.m.) (acknowledging that Mazzei did not keep a contemporaneous record of expenses); In re Brown, Case No. 08-10419-TPA, Hearing Held in Courtroom C, March 27, 2013 (3:07 p.m.).

reconciliation of the actual costs against the amounts advanced in the expense retainer.[19]

As a result, Mazzei failed to voluntarily return the unused portion of the retainer at the

conclusion of his representation.  See Pa. R.P.C. 1.16.

      Mazzei's transgressions impact not only his closed cases, but those which

remain active on the Court's docket as well.  As previously noted, Mazzei sold his entire

law practice to Paul McElrath on September 1, 2013.  In re Mazzei, 522 B.R. 113, 122

(Bankr. W.D. Pa. 2014).  The transfer included all material assets of the Mazzei firm,

including the right to service (subject to client consent) an inventory of over 900 chapter

13 cases.  See In re Mazzei, Bankr. Case No. 13-00203-GLT, Dkt. No. 152.  Upon

completion of the sale and the transfer of cases to McElrath, Mazzei's representation

terminated, thereby triggering his obligation to refund the unused portion of the expense

retainer to his former clients or, alternatively, turning the funds over to McElrath.  The

record shows that he did neither.

      Although McElrath and his law firm took over the representation of these

debtors, Mazzei failed to transfer the expense retainers to the acquiring firm.[20]  As an

assignee of Mazzei's rights under the fee agreements, McElrath was entitled to tap into

the expense retainer for ongoing costs incurred during the representation of Mazzei's

former clients.  Mazzei kept all of the retainers paid in the transferred cases, including

---

[19]    See Linkel, audio transcript of Hearing Held in Courtroom A, May 1, 2014 (11:46 a.m.) (Mazzei acknowledges that he did not calculate expenses until after the fact when ordered to do so by the Court); see also Response, at ¶ 15 (denying that his Fee Agreement imposes a duty to reconcile and refund any portion of the prepaid expense retainer).

[20]    In re Rogosz, Bankr. Case No. 12-20690-GLT, Dkt. No. 63, at ¶ 11.

those received just weeks prior to the sale.[21]  As a result of this conduct, money that was

earmarked for future expenses has vanished.  Unless Mazzei is held accountable for these

funds, clients may bear the burden of paying for case expenses a second time.

## A.

Mazzei's initial argument, that he cannot accurately track expenses, must

fail due to the requirements imposed on professionals by the Bankruptcy Code.  To the

extent debtor's counsel seeks payment for work performed on behalf of the estate, the

fees and expenses must be approved by the Court.  See 11 U.S.C. § 330(a)(4)(B) (the

court may allow "reasonable compensation to the debtor's attorney . . . based on a

consideration of the benefit and necessity of such services to the debtor and the other

factors set forth in this section.");  Fed. R. Bankr. P. 2016(a).  Approval is typically

obtained through the filing of a fee application.  In chapter 13 cases pending in this

District, however, a fee application is unnecessary when counsel elects to receive the

"no-look fee" established by the Court.  W.PA.LBR 2016-1(a).[22]  As part of any fee

---

[21]    The Court concludes that Mazzei had no intention of reconciling the accounts or returning the excess to clients because the funds were depleted shortly after they were received.  By way of example, Mazzei received an expense retainer of $1,000 from Ralph and Rita Jackson on January 4, 2013.  In re  Jackson, Bankr. Case No. 13-20059-TPA, Dkt. No. 13, at ¶ 9 of the Statement of Financial Affairs.  After examining the 71 entries on the Court docket between January and September 2013, it is difficult to see how Mazzei could have exhausted the entire retainer by the time his practice was sold just nine months later.  The Court expects a similar set of circumstances may exist in the other 308 cases filed by Mazzei's office in 2013.  This statistic was calculated on July 1, 2015 by totaling all chapter 13 cases filed from January 1, 2013 to December 31, 2013 in which Mazzei & Associates was listed as counsel of record in the Court's CM/ECF system.

[22]    The "no-look attorney fee" represents the maximum amount that can be paid to debtor's counsel without the necessity of a fee application.  W.PA.LBR 2016-1(f).  The "no-look attorney fee" was originally set at $2,000 for cases filed prior to October 17, 2005, but it has been periodically increased by the Court.  See In re Younger, 360 B.R. 89, 93 (Bankr. W.D. Pa. 2006).  Beginning on September 20, 2013, the "no-look attorney fee" was set at $4,000, while a "no-look expense charge" of $500 was introduced for allowable expenses charged during the administration of the case.  W.PA.LBR 2016-1(f); see also General Order No. 2013-10 issued by Chief Judge Thomas

14

application, counsel must submit "an itemization of the expenses for which reimbursement is requested[.]"  W.PA.LBR 2016-1(c)(6); <u>see</u> <u>also</u> Fed. R. Bankr. P. 2016(a) (requiring "a detailed statement of . . . [the] expenses incurred.").  Therefore, submission of a breakdown of expenses is a prerequisite to obtaining Court approval for payment.

An itemization of expenses is required because the Court may authorize reimbursement for only those actual and necessary expenses of the estate.  11 U.S.C. § 330(a)(1)(B).   The applicant bears the burden of providing sufficiently detailed information to demonstrate the necessity of each expense.  See <u>In re Jefsaba, Inc.</u>, 172 B.R. 786, 802 (Bankr. E.D. Pa. 1994) ("In order to establish a right to reimbursement of expenses, the applicant's requests must be sufficiently detailed to enable the Court to perceive the actual and necessary nature of the expense."); <u>In re Armstrong World Indus., Inc.</u>, 366 B.R. 278, 280 (D. Del. 2007); <u>Matter of Concrete Products, Inc.</u>, 208 B.R. 1000, 1014 (Bankr. S.D. Ga. 1996) (citing <u>In re Jensen-Farley Pictures, Inc.</u> 47 B.R. 557, 584 (Bankr. D. Utah 1985)).  "Only fully documented, actual, out-of-pocket expenses will be reimbursed." <u>In re S.T.N. Enters., Inc.</u>, 70 B.R. 823, 834 (Bankr. D. Ver. 1987).  Without an itemization, the Court can neither assess the "benefit and necessity" of the charges, nor can it evaluate whether the request satisfies the requirements of section 330 of the

P. Agresti on September 20, 2013 (available at http://www.pawb.uscourts.gov/general-orders). Since Mazzei did not file any new cases after September 20, 2013, the "no-look expense charge" is inapplicable.

Bankruptcy Code.[23]  If a professional lacks the ability to track expenses, then he forfeits the right to obtain reimbursement of funds advanced on behalf of the client.

The Court rejects Mazzei's claim that it is impossible to provide an accurate expense report.  Since its enactment in 1978, the Bankruptcy Code has always conditioned the reimbursement of costs upon proof that they were both "actual and necessary" expenses of the estate.  <u>See</u> Act of Nov. 6, 1978, Pub. L. No. 95-598, 92 Stat. 2549.  Countless professionals have obtained reimbursement for their costs by submitting proof of the expenses incurred in each case.  Each year, the Court reviews numerous fee applications from sole practitioners, chapter 7 trustees, and lawyers with practices similar to Mazzei who are able to maintain an expense ledger in each case.  While the task of recording expenses may be cumbersome, it is no different than the obligation to track the time spent providing legal services to the client.  <u>See</u> <u>In re Jefsaba, Inc.</u>, 172 B.R. at 802 ("Just as time entries must be precisely recorded and described, so must entries relating to expenses.").  Ultimately, bankruptcy professionals must make a decision as to whether the benefits are worth the burdens.   Those who seek payment from the estate will devise an appropriate accounting system to capture their time entries and cash advances, while those who do not comply must absorb these expenses as a "cost of doing business."

---

[23]    The "other factors" set forth in section 330 include:  (1) the time spent on such services; (2) the rates charged for such services; (3) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title; (4) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; (5) with respect to a professional person, whether the person is board certified or otherwise has demonstrated skill and experience in the bankruptcy field; and (6) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.  11 U.S.C. § 330(a)(3)(A)-(F).

Mazzei should have provided an expense itemization for another, more fundamental reason:  his retention agreement compels it.  Pursuant to the *Fee Agreement*, Mazzei is contractually obligated to reconcile his actual expenses at the conclusion of each case.  See *Fee Agreement*, at sections 1 and 4 ("[A]n itemization will be provided to you and to the Bankruptcy Court seeking compensation for additional fees and/or costs.").   If the expense retainer exceeds the amount of actual costs incurred, the client is entitled to a credit or refund.  Id. at section 1 ("In the event that fees and expenses do not total the amount stated herein, then any overpayment will be applied toward your legal fee."). Accordingly, Mazzei compelled himself to track expenses from the outset of the engagement.  To deliver on his promise, Mazzei must produce a reliable accounting of the expenses incurred during the course of the representation.  If Mazzei fails to substantiate his out-of-pocket costs, the Court can only conclude that no reimbursable expenses were incurred and the expense retainer remains completely intact.

## B.

Mazzei claims the expense retainer is underfunded because the actual expenses incurred in a chapter 13 case exceed the $900 deposit he typically receives.  To date, Mazzei has offered no evidence to substantiate this assertion, and since he did not contemporaneously track expenses, it is doubtful that any reliable evidence exists.[24]  In those cases where Mazzei was ordered to perform an expense reconciliation, the opposite has proven true.  Each time Mazzei tallied the costs incurred in a particular case, the

---

[24]     If expenses routinely exceeded the retainer, Mazzei had the opportunity to request reimbursement by filing a fee application with the Court.  The absence of fee applications suggest this was not a common occurrence.

"standard" expenses averaged less than $600, compelling the Court to order a refund of the excess funds.[25]

The Court also received a number of reconciliations from McElrath, who assumed the representation of virtually all of Mazzei's clients in September 2013. Using the same Fee Agreement as Mazzei and relying upon the same historical records and accounting methods to compile the list of incurred expenses, McElrath's calculations suggest the expense retainer was *over*funded by an average of $400 per case.[26] Once again, these records indicate that if a reconciliation is performed, the client will be entitled to a refund.

The Court also finds no merit to the generalization that all successful cases generate significant expenses. While some cases undoubtedly require more work, others

---

[25]   See *Billing Invoice for Case No. 10-27856-GLT*, In re Linkel, Bankr. Case No. 10-27856-GLT, Dkt. No. 64 (identifying total costs in the amount of $399.41); see also *Affidavit of Itemization of Expenses on Case No. 11-71114-JAD David M. Marsinko and Case No. 12-11720-TPA Joseph E. McGraw*, In re All Cases in Which Jason J. Mazzei is Attorney of Record, Bankr. Case No. 13-00203, Dkt. No. 159. The Court considers the "standard" expenses to include those typically incurred by debtor's counsel in the course of the representation. This includes the case filing fee, copy charges, postage, PACER fees, substantiated travel expenses, and charges for obtaining tax transcripts, a credit report, prepetition credit counseling, and the postpetition financial management course. In recent weeks, Mazzei's reconciliation has been augmented to include additional charges deemed to be "non-standard" by the Court. The "non-standard" charges include storage fees, a file retrieval fee, a file destruction fee, undocumented travel expenses, and costs associated with issuing a refund check to a client. The Court will deal with the allowance of "non-standard" expenses as the issues may arise in each case.

[26]   See In re Rogosz, Bankr. Case No. 12-20690-GLT, Dkt. No. 63, at Exhibit A (excess retainer of $491.75); In re Farmer, Bankr. Case No. 09-26570-GLT, Dkt. No. 102 (excess retainer of $441.75); In re Bassetti, Bankr. Case No. 10-24695-GLT, Dkt. No. 128 (excess retainer of $431.63); In re Martens, Bankr. Case No. 10-27588-GLT, Dkt. No. 105, at Exhibit D (excess retainer of $541.75); In re Hoenig, Bankr. Case No. 10-21505-GLT, Dkt. No. 173, at Exhibit D (excess retainer of $541.75); In re Hailey, Bankr. Case No. 12-21537-GLT, Dkt. No. 124, at Exhibit D (excess retainer of $293.75); In re Chesebrough, Bankr. Case No. 10-21053-GLT, Dkt. No. 142 (excess retainer of $313.48); In re Eperjesi, Bankr. Case No. 12-21945-GLT, Dkt. No. 85 (excess retainer of $161.26).

move seamlessly through the system. After reviewing Mazzei's case inventory, the Court identified numerous "routine" cases in which a successful outcome was achieved without litigation and with little resistance from creditors. In several cases, a discharge was entered on dockets containing less than 60 entries.[27] When docket activity is nominal, expenses should be modest since counsel does not have as many documents to copy, serve, and file during the case.

It is improper to paint the "successful" cases with a broad brush because the outcome of a case is not determinative of the costs that may be incurred. Instead, the costs must be analyzed on a case-by-case basis. Based on this limited sampling, the Court has reason to believe that if Mazzei were compelled to itemize his expenses in every case (as he was required to do), the actual costs would be substantially less than the amount held as a expense retainer. To the extent any overpayment exists, these funds should be returned to the debtors or transferred to their replacement legal counsel.

## C.

Mazzei contends that if the expense retainer was overfunded, he is entitled to keep the excess funds by applying them against his unpaid legal fees. See *Response*, at A.7. This argument must also fail. Mazzei cannot use the expense retainer to satisfy legal fees without first making the requisite disclosures to the Court. To date, the Court finds no instance where the proper disclosures were made. Mazzei must also obtain Court approval prior to receiving compensation in excess of the "no-look" fee. In those

---

[27]    See In re Hanzek, Bankr. Case No. 11-70091-JAD (56 docket entries over three years); In re Kozikowski, Bankr. Case No. 10-28846-GLT (65 docket entries over four years); In re Lambing, Bankr. Case No. 09-70578-GLT (37 docket entries over five years).

cases where the "no-look" fee was already paid, Mazzei is prohibited from receiving additional compensation in the absence of a Court Order.

The compensation of bankruptcy professionals is a highly-regulated affair. The Bankruptcy Code and Bankruptcy Rules impose a myriad of requirements designed to protect the debtor from the debtor's attorney.  See In re Lewis, 113 F.3d 1040, 1045 (9th Cir. 1997).[28]   Among other obligations, section 329 of the Bankruptcy Code mandates full disclosure of the terms of compensation under which an attorney agrees to provide services to a debtor, regardless of whether the attorney applies for compensation in the bankruptcy case.  See 11 U.S.C. § 329(a).  The disclosure must reflect the terms of past, present, and future fees contemplated during the case, including those "paid or agreed to be paid[.]"  Id.; Fed. R. Bankr. P. 2016(b) (requiring disclosure of the amount of compensation that "has or will be received" in consideration for services rendered in the bankruptcy case); In re Snyder, 445 B.R. 431, 437 (Bankr. E.D. Pa. 2010).  The timely disclosures made under Bankruptcy Code section 329 and Bankruptcy Rule 2016 are essential to the integrity of the bankruptcy process.  In re Andreas, 373 B.R. 864, 872 (Bankr. N.D. Ill. 2007); see also In re Levin, No. 97-75574, 1998 WL 732878 (Bankr. E.D. Pa. 1998).  The disclosures provide notice to all creditors and parties in interest of the payments made by the debtor, and provide those parties with the opportunity to object

---

[28]    "The Revision Notes and Legislative Reports to [section] 329 explain that '[p]ayments to a debtor's attorney provide serious potential for evasion of creditor protection provisions of the bankruptcy laws, and serious potential for overreaching by the debtor's attorney, and should be subject to careful scrutiny.'"  In re Engel, 124 F.3d 567, 573 (3d Cir. 1997) (quoting H.R. Rep. No. 95-595, at 329 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6285; S. Rep. No. 95-989, at 39 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5825).

to any unreasonable fees.  In re Hackney, 347 B.R. 432, 442 (Bankr. M.D. Fla. 2006),

*order amended on reconsideration* 2006 WL 3804678 (Bankr. M.D. Fla. 2006).

Mazzei made his disclosures on the form mandated by Bankruptcy Rule

2016 (the "2016 Statement").[29]  In virtually all of his cases, Mazzei agreed to provide

representation for a fee equivalent to the prevailing "no-look" amount established by the

Court.  See e.g., In re Marsinko, Bankr. Case No. 11-71114-JAD, Dkt. No. 12, at

*Disclosure of Compensation of Attorney for Debtor(s)*.  The fee represents the minimum

charge for Mazzei's legal services as he agreed to bill the client for work performed at an

hourly rate.  In both the 2016 Statement and his *Fee Agreement*, Mazzei acknowledged

that he could not receive payments in excess of the "no-look" amount without filing a fee

application with the Court.  See id. ("In the event hourly services exceed the above-stated

amount, additional fees will be requested."); *Fee Agreement* at section 4.

Within the 2016 Statement, Mazzei draws a sharp distinction between the

two types of client retainers he typically receives.  He fully discloses payment of the legal

fee retainer, but the 2016 Statement is devoid of any reference to the separate and much

larger expense retainer.[30]  Because the disclosure represents the "complete statement" of

---

[29]     See Official Bankruptcy Form B 203.

[30]     As in most of Mazzei's bankruptcy cases, the debtor's statement of financial affairs contains the
only revelation within the record that an expense retainer was even paid.  See In re Marsinko,
Bankr. Case No. 11-71114-JAD, Dkt. No. 12, at ¶ 9 of the *Statement of Financial Affairs*
(indicating payment of "costs" in the amount of $900).  The submission of a statement of financial
affairs ("SOFA") is mandated by section 521(a)(1)(B)(iii) of the Bankruptcy Code.  11 U.S.C. §
521 (a)(1)(B)(iii).  Among other disclosures, the debtor is required to identify all payments made
within one year of the case to an attorney or other individual related to the preparation of the
bankruptcy case.  See, e.g., In re Kaib, 448 B.R. 373 (Bankr. W.D. Pa. 2011).  The disclosures on
the SOFA are not a substitute for the Rule 2016 statement and do not satisfy the requirements of
section 329 and Rule 2016.  Geisenberger v. DeAngelis, Civ. A. No. 10-01660, 2011 WL 4458779

any "agreement or arrangement" for the payment of legal services, the omission of the

expense retainer as a funding source in the 2016 Statement serves as Mazzei's admission

that he will not use these funds to pay his legal expenses.  See 2016 Statement.

To the extent Mazzei used the expense retainer to pay attorneys' fees, he

violated the requirements of section 329 of the Bankruptcy Code when he failed to

disclose this information to the Court.[31]  Once applied to legal fees, a retainer ceases to be

an "expense" retainer, and instead becomes a "fee" retainer.  As a new source of payment

for compensation, the funds fall within the scope of section 329 and Mazzei was required

to amend his 2016 Statement to divulge this information.

Attorneys who fail to make the required fee disclosures face the prospect

of significant sanctions.  The bankruptcy court is vested with broad powers to evaluate

compensation arrangements between a debtor and her counsel.  See In re Engel, 124 F.3d

567, 572 (3d Cir. 1997).  Consequently, courts have wide discretion to design appropriate

remedies to deal with violations of fee disclosure obligations.  In re All Cases of Musher,

387 B.R. 669, 675 (Bankr. W.D. Pa. 2008); In re Pawlak, 483 B.R. 169, 180 (Bankr.

W.D. Wis. 2012).  Sanctions imposed on an attorney for violating his fee disclosure

obligations have ranged from the denial of future compensation to the partial or total

---

(M.D. Pa. Sept. 23, 2011) (citing In re Smitty's Truck Stop, Inc., 210 B.R. 844, 849 (10th Cir. 1997)).

[31]     The Court need not decide whether a retainer used exclusively for the payment of expenses should be disclosed on a 2016 Statement at the outset of the case.  Mazzei claims he began the practice of listing the expense retainer on the SOFA, in lieu of the 2016 Statement, at the direction of another bankruptcy judge.  Despite repeated requests, Mazzei has yet to offer the Court a citation to any case in which this specific ruling was entered.  Because the issue is not determinative of the matters pending in this proceeding, the Court will refrain from addressing it at this time.

disgorgement of fees previously paid.  In re Kaib, 448 B.R. 373, 378 (Bankr. W.D. Pa. 2011); In re Greco, 246 B.R. 226, 231 (Bankr. E.D. Pa. 2000); In re Whitcomb, 479 B.R. 133, 144 (Bankr. M.D. Fla. 2012).   In this instance, Mazzei's failure to disclose jeopardizes his right to receive payment of legal fees from the unused expense retainer and places all of those fees at risk for disgorgement.

Mazzei's use of the expense retainer to pay legal fees is also problematic to the extent the additional fees were not approved by the Court.  As a general rule, bankruptcy professionals cannot obtain payment of their postpetition legal fees without filing a fee application.  See Fed.R.Bankr.P. 2016(a); Baker Botts, L.L.P. v. ASARCO LLC, 135 S.Ct. 2158, 2163 (2015).  A limited exception to the rule exists in this District for debtor's counsel in chapter 13 cases.  As noted above, these attorneys are authorized by the Local Rules to receive legal fees up to the "no-look" amount without submitting a fee application.  See W.PA.LBR 2016-1(f).  For each dollar in legal fees that exceeds the "no-look" amount, a fee application is required and counsel is prohibited from receiving payment without a Court Order.

Contrary to Mazzei's assertions, his use of the expense retainer was not authorized by the Court whenever a confirmation order was entered in one of his cases.[32] Rather, the opposite was true.  In each confirmation order, the Court required that Mazzei file a fee application as a precondition to receiving any payment in excess of the "no-look"

---

[32]   See Jason Mazzei's Supplemental Brief Pursuant to May 13, 2015 Order, Dkt. No. 152.  Referring to both In re Marsinko, Bankr. Case No. 11-711140-JAD, and In re McGraw, Bankr. Case No. 12-11720-TPA, Mazzei argues that "[b]oth plans were confirmed on a final basis by the Court, and as such, all objections were deeded [sic] waived and the terms of the case accepted, per the Order confirmation [sic] the plan."

fee.[33]  Mazzei's chapter 13 plans contained no reference to the expense retainer, and

therefore the Court can find no provision which would authorize, even indirectly, his

payment of legal fees from the expense retainer.  It is also noted that in many bankruptcy

cases (including both the Marsinko and McGraw cases), Mazzei never filed a copy of the

applicable fee agreement.  Without this information in the record, the Court would have

no basis to conclude that Mazzei ever intended to apply a portion of the expense retainer

against his legal fees if given the chance.

If, as he claims, Mazzei applied the unused expense retainer against

unpaid legal fees, he received an improper payment in each of those cases where the "no-

look" fee was already paid and no fee application was approved.  Mazzei is therefore

obligated to disgorge the unauthorized fees in every case where these events occurred.

To illustrate the extent of this problem, the Court reviewed over 300

chapter 13 cases filed after January 1, 2009 in which Mazzei's clients obtained a

discharge.  Through an examination of all publicly-available information in each case, the

Court was able to discern the total amounts Mazzei received as payment of his fees and

expenses, including all amounts paid as an expense retainer, a fee retainer, or a payment

from the chapter 13 trustee.[34]  Because each of the examined cases is closed, Mazzei had

---

[33]    See Marsinko, Dkt. Nos. 38, 78, and 118; McGraw, Dkt. No. 61. Section 3(D) of the confirmation
order in each case provides that "Debtor's counsel must file a fee application in accordance with
W.PA.LBR 2016−1 before attorneys' fees in excess of the "no look" provision (including retainer)
will be allowed or paid."

[34]    In each case, the Court deduced the amount of the "fee" retainer from the 2016 Statement and the
amount of the "expense" retainer from the SOFA (question #9).  The Court also reviewed the
docket for any Court order that may have authorized the payment of attorneys' fees to debtor's
counsel (including an order approving a fee application, awarding sanctions to the debtor,
approving the sale of assets, or authorizing the payment of an additional $1,000 no-look fee for

been afforded an opportunity to pursue a fee application in the event he accumulated

unpaid legal fees in excess of the "no-look" amount.   A spreadsheet summary of the

Court's review is filed on the docket of this case as *Appendix A* to this *Memorandum*

*Opinion*.

        In practically every case examined, the Court found that Mazzei received

the "no-look" fee in its entirety.   The Court also observed that when additional fees were

approved, they were likewise paid in full.   In all, the Court could identify only one case

where Mazzei had allowed but unpaid legal fees for which he could apply the unused

expense retainer.   Through this limited sample, the Court finds that Mazzei may have

been able to tap into the expense retainer in less than 1% of his cases.   In the remaining

cases, Mazzei has no justification for retaining the funds to satisfy his legal fees.

        Upon reviewing this data, the Court sought to determine, on a preliminary

basis, the extent to which Mazzei may have retained funds to which he was not entitled.

To begin, the Court calculated the standard "fixed" expenses that are expected within a

typical bankruptcy case.[35]   The Court also allotted a $150 credit for any "variable" costs

---

loss mitigation cases).   The Court consulted the *Chapter 13 Standing Trustee's Final Report and Account*, also known as UST Form 13, to confirm the total amount of fees Mazzei received during the case.

[35]    The fixed expenses are estimated to include the case filing fee (ranging from $274 to $306, (see below)) and the following charges:   credit report ($38), credit counseling ($15), financial management course ($9), tax transcript ($22.25), and, to the extent applicable, the fee to participate in the Court's loss mitigation program ($25).

The case filing fee could vary depending on when the case was filed and the chapter under which the debtor initially requested relief.   For chapter 13 cases filed between April 9, 2006 and October 31, 2011, the filing fee was $274.   For chapter 13 cases filed between November 1, 2011 and July 31, 2014, the filing fee increased to $281.   Certain cases in the sampling began as a chapter 7 case and were later converted to a chapter 13 cases.   The filing fee for chapter 7 cases filed between

incurred.  The Court arrived at this amount after considering the expense itemizations

produced by Mazzei and McElrath (in response to prior Orders) which suggest that

variable costs average $130 per case.[36]  The Court then deducted the fixed expenses,

variable expenses, and any allowed, but unpaid legal fees from the expense retainer

reported on the SOFA in each case.[37]  After taking these costs into account, it appears

that the expense retainer was overfunded by an average of $331 in each case.  This means

that on a cumulative basis, Mazzei may have been overpaid by a total of approximately

$105,000 in just those cases examined by the Court.  Considering that this sample

represents only a small percentage of Mazzei's total case inventory, the aggregate

overpayment could be significantly higher.

A precise determination of any overpayment in each case will no doubt

require a factual determination.  Moreover, the Court indicated its intent to give the

parties an opportunity to review and respond to the information contained on the

---

April 9, 2006 and October 31, 2011 was $299, but it increased to $306 for chapter 7 cases filed
between November 1, 2011 and July 31, 2014.

Pursuant to W.PA.LBR 9020-7, a $25 fee (payable to the administrator of the LMP portal) was
initially required to participate in the Court's loss mitigation program.  This fee was increased to
$40 as of February 15, 2015.  See General Order No. 2015-1 issued by Chief Judge Jeffery A.
Deller on January 27, 2015 (available at http://www.pawb.uscourts.gov/general-orders).   Because
the cases examined by the Court entered the loss mitigation program prior to February 2015, the
recent increase had no impact on the Court's analysis.

[36]     The variable costs consist of PACER charges, postage, copy charges, and miscellaneous expenses
that, by their nature, may differ from case to case.

[37]     For the purposes of this analysis, the Court accepted as true the standard expenses identified by
Mazzei and McElrath on their expense itemizations.  When assessing the costs incurred in a
particular case, the Court will require some evidence that the expenses were actually incurred in
the amounts alleged.

spreadsheet summarizing the Court's review of a sampling of Mazzei's cases.  As a result, the data merely constitutes the Court's preliminary findings and remains subject to further refinement at the conclusion of any evidentiary hearing on these matters. Nevertheless, the spreadsheet should provide guidance as to how the Court evaluates the expense retainer issues when confronted with a settlement or proposed resolution of the underlying allegations.

While a sampling of the cases provides a glimpse of Mazzei's potential liability from a macro level, it is important not to lose sight of the repercussions Mazzei's conduct may have imposed upon individual debtors.  Nothing illustrates this better than a review of Rebecca Farmer's bankruptcy case.  See In re Farmer, Bankr. Case No. 09-26570-GLT.

Mazzei filed a chapter 13 case for Ms. Farmer on September 4, 2009.  In accordance with her confirmed plan, Ms. Farmer agreed to make monthly plan payments of $854 over a period of 60 months.  Id. at Dkt. Nos. 11 and 40.  On January 5, 2015, the chapter 13 trustee filed a motion requesting dismissal of the case because Ms. Farmer failed to fully fund her plan within the 60-month plan term.  Id. at Dkt. No. 87. According to the trustee's records, an additional payment of $525 was all that remained necessary to complete a plan base of more than $51,000.  Id. at Dkt. Nos. 87, 14, and 29.

Despite satisfying 99% of her plan obligations on a timely basis, Ms. Farmer struggled to provide the remaining funds necessary to complete her plan.  The hearing on the trustee's motion was continued twice to afford Ms. Farmer additional time to obtain the necessary payment.  Id. at Dkt. Nos. 93, and 96-98.  By April 2015, Ms.

27

Farmer was finally able to stave off a dismissal when sufficient funds were paid to the

trustee to satisfy the plan base. Id. at Dkt. Nos. 103-104.

The importance of the final payment cannot be understated.  If Ms.

Farmer's case was dismissed, she would forfeit the right to obtain a discharge of her

debts as provided by section 1328 of the Bankruptcy Code.  The ability to obtain a "fresh

start" through discharge represents one of the primary motivations for filing a bankruptcy

case, and the loss of this relief would negate more than five years of hard work and

sacrifice by the debtor.

Mazzei jeopardized Ms. Farmer's ability to obtain a discharge by failing to

provide her with a refund of the unused expense retainer.  Prior to the bankruptcy filing,

Ms. Farmer paid a $1,500 retainer to Mazzei, consisting of $850 for expenses and $650

for legal fees.  Farmer, Dkt. No. 10, at pp. 25 and 31.  Because an expense reconciliation

was never performed, the Court ordered McElrath, who substituted for Mazzei as counsel

of record, to itemize the actual expenses incurred in the case.  Id. at Dkt. No. 98.

McElrath reported that the total costs were $408.25, thereby leaving a surplus of $441.75

in the expense retainer.[38]  Id. at Dkt. No. 102.  Since this was the end of the case, Ms.

Farmer was entitled to a refund of the unused expense retainer, but McElrath claims he

could not provide it because Mazzei never transferred these funds to him.  Id. at Dkt. No.

100.  Based on the record before the Court, Mazzei had no basis to keep the excess

---

[38]    McElrath's report purports to include a disclaimer which suggests it was prepared "without input
from Mazzei and Associates and may exclude actual appropriate expenses which are not
recorded." Farmer, Dkt. No. 102.  Since McElrath acquired Mazzei's practice (including all of its
books and records) and prepared this information after reviewing the firm's accounts, it is doubtful
that any "input from Mazzei" would reveal any additional information that might be either
relevant or reliable with respect to the computation of the actual expenses incurred in this case.

expense retainer, and it should have been returned to Ms. Farmer to complete her plan funding.[39]  The fact that Ms. Farmer was on the verge of losing her discharge due to the conversion of her expense retainer underscores the Court's resistance to any global settlement that does not provide recourse to clients aggrieved by Mazzei's actions.

## D.

The Court would be remiss if it did not address another argument raised in these proceedings.  Mazzei claims he is being unfairly targeted by the Court when other lawyers collect expense retainers and receive no scrutiny or reprimand.  Once again, Mazzei misses the mark.  The issue is not that he collects an expense retainer, but rather, what he does with it.  As acknowledged above, lawyers are entitled to collect advance fee retainers to pay costs and expenses as they are incurred.  Upon receipt of these funds, the attorney owes a duty to maintain an itemization of the expenses for which he may be entitled to draw against the fund.  He is also obligated to provide an accounting to the client.  Once the engagement terminates, the attorney must refund any residual balance to the client.  To the extent a lawyer adheres to these requirements as well as the payment and disclosure requirements of the Bankruptcy Code, the collection and use of expense retainers is acceptable.

---

[39]      For the reasons discussed previously, Mazzei was not authorized to apply any portion of the expense retainer against unpaid legal fees in Ms. Farmer's case.  Mazzei agreed to accept a fee of $3,100 for legal work on her case for which he was fully paid.  See Farmer, Dkt. No. 10, at *Disclosure of Compensation of Attorney for Debtor(s)*.  In addition to the $650 legal retainer, Mazzei received a total of $2,450 from the chapter 13 trustee.  Id. at Dkt. No. 109.  Together, these amounts represented the "no-look" fee in effect at the time Ms. Farmer's case was filed.  Since Mazzei did not file a fee application or pursue loss mitigation on behalf of Ms. Farmer, $3,100 represents the maximum legal fee Mazzei was entitled to receive on the case.

Mazzei has done none of this.  He did not maintain separate ledgers for each client file, nor did he provide an accounting of the actual expenses incurred in each case.  Unless ordered to do so by the Court, Mazzei failed to refund any portion of the unused expense retainer to his clients.  Irrespective of whether other counsel performed these tasks, Mazzei did not.[40]   The misconduct of others – whether real or perceived – does not absolve Mazzei of his culpability, and the Court will hold him accountable for his actions.[41]   See Musher, 387 B.R. at 675 (citing In re Berg, 356 B.R. 378, 382 n.4 (Bankr. E.D. Pa. 2006) (the bankruptcy court's failure to monitor compliance is not an invitation to ignore the requirements, but rather, when a breach is uncovered, it will be dealt with)).

## III.

While disbarment is certainly a significant sanction, it does nothing to unwind the damage Mazzei may have caused if he improperly enriched himself with client monies.  The Court acknowledges that performing an expense reconciliation in over 1,000 cases is a daunting task, but this is precisely what Mazzei agreed to do when he entered into a fee agreement with each of his clients.  To the extent Mazzei misappropriated the expense retainers, his clients should not lose the right to obtain a refund of the monies they are rightfully owed.  Absent an appropriate remedy for

---

[40]   Although the conduct of other counsel is not presently before the Court, the obligations and expectations of the Court remain the same.

[41]   There is a practical explanation as to why Mazzei's use of the expense retainer has drawn close attention.  Based on the Court's experience, Mazzei's expense retainer is nearly double the amount collected by other counsel.  If the costs in a typical chapter 13 bankruptcy average $490.90 per case (as McElrath's itemizations suggest), then Mazzei's cases are more susceptible to the obligation to issue a refund.

Mazzei's clients to obtain restitution, the *Consent Motion* leaves a substantial portion of the *List of Particulars* unaddressed.   For these reasons, the *Consent Motion* will be denied.

      A separate Order will issue.

Dated:  July 1, 2015

                        GREGORY L. TADDONIO
                        UNITED STATES BANKRUPTCY JUDGE